UNITED STATES, Appellee,

v.

Frank ARACHE, Defendant, Appellant.

No. 90–1874.

United States Court of Appeals,
First Circuit.

Heard June 6, 1991.
Decided Sept. 27, 1991.

George F. Gormley, by appointment of the Court, with whom Jackie Lynn Segel and Law Office of George F. Gormley were on brief, for defendant-appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and Lawrence D. Gaynor, Asst. U.S. Atty., were on brief, for appellee.

Before SELYA and CYR, Circuit Judges, and STAHL,* District Judge.

STAHL, District Judge.

Following a trial in the United States District Court for the District of Rhode Island, defendant-appellant Frank Arache was convicted of three drug trafficking offenses. His co-defendant, Wanda DeJesus, who had been charged with the same offenses, was convicted of conspiracy.[1] Subsequently, presiding Judge Ronald Lagueux denied each defendant's motions for new trial and judgment of acquittal. Upon a weekend's reflection, Judge Lagueux decided, *sua sponte*, to reconsider those motions. At a hearing convened four days after the close of trial he granted Ms. DeJesus' motion for judgment of acquittal.

---

* Of the District of New Hampshire, sitting by designation.

1. Ms. DeJesus is not a party to this appeal.

Although Judge Lagueux refused to acquit Arache, he noted inconsistencies in testimony given by government witnesses and then granted Arache's motion for a new trial.

After a subsequent trial before the Honorable Ernest Torres, a second jury found Arache guilty of trafficking in cocaine base (crack) and cocaine. Although Judge Torres also expressed concern about the reliability of testimony by the same government witnesses, he nevertheless denied Arache's motion for a new trial and sentenced Arache to 151 months of imprisonment followed by five years of supervised release.

Arache appeals, asking that this court: (a) reverse his conviction and order his acquittal; (b) remand the case to Judge Lagueux for clarification of his rulings after the first trial; or (c) order a new trial without the asserted untrustworthy government testimony. In addition, Arache contends that Judge Torres should have reduced the guideline offense level under which he was sentenced, since the evidence showed that he was a "minor" or "minimal" participant in the trafficking crimes.

For the reasons explained below we are not persuaded that Arache's conviction should be reversed, that clarification of Judge Lagueux's rulings is required or that a new trial should be granted. Finally, Arache has failed to persuade us that there was error in the sentence imposed. Accordingly, we affirm.

## I. Background

Frank Arache and his common-law wife, Wanda DeJesus, were indicted on August 17, 1989, charged with: (1) conspiracy to distribute and possess with intent to distribute crack and cocaine; (2) possession with intent to distribute a specified amount of crack; and (3) possession with intent to distribute an unspecified amount of cocaine. Evidence from their joint trial is summarized below.

On July 28, 1989, at approximately 2:30 in the afternoon, a group of eight police officers went to an apartment at 187 Bridgham Street in Providence for the purpose of executing a search warrant. Upon arrival the search team split, with some of the officers attempting to enter through the front door of the apartment and the others proceeding to a side door. The officers at the front door knocked, identified themselves as police and, upon hearing a commotion inside, began to batter the locked door with a ram. They were unable to open the front door.

The officers at the side door noticed the lock being turned. When the door opened, the officers confronted Wanda DeJesus and Frank Arache. All eight officers entered the apartment through the side door.

Once inside the premises the search began. Nothing of significance was discovered during the first half hour. Then, as Nicholas Cardarelli, lead investigator (and first witness at the trial) explained,

> ... I just knew there was something in this apartment. Call it instinct or whatever, so I walked back into the bedroom area and myself and Detective Jeff Ward was alongside of me, so at that time I noticed that closet again, I'm looking at the closet, and I'm looking at the door, and I've had previous experience in carpentry work, and as I looked at this door I said out loud, actually saying it to myself, not saying it to anyone else, this door doesn't look right. So what I did is I opened the door a little more, and on what would be the doorknob side, not the hinged side, I noticed two cuts in the side of the door if you're looking at the edge of the door, I noticed two cuts. So at that point, I noticed the facing of the door, and I noticed like small little screws and nails, which doors are not built with. If you look at your own doors, you're going to see that doors are not built that way. So I started pulling the plywood off the door, the facing, and I pulled one piece off and I noticed it was hollow, so I continued to rip the plywood off the door, and bingo, I noticed a compartment in the door. Those two little cuts were actually a compartment that slid inside the door.

The compartment was two and one-half inches wide, six to seven inches deep, and

approximately two and one-half feet long. Officer Cardarelli testified that the box contained a number of plastic bags which he suspected were filled with crack cocaine. He further observed "another plastic bag which contained smaller plastic bags, little envelope type plastic bags, that were green in color, of powder cocaine," some United States currency, and a small leather pouch. Officer Cardarelli stated that he found "a clear white piece of paper with nothing on it" inside the pouch.

Cardarelli testified that he placed the pouch on the bed, put the box under his arm, retrieved a camera from his car, returned to the apartment, placed the box back in the door and took pictures. He then searched Frank Arache, who was being held in the apartment's parlor. Cardarelli testified that he seized a set of keys from Arache's right front pocket, one of which fit a padlock on the apartment's front door. From the kitchen table Cardarelli also seized three pieces of mail, none of which were addressed to either DeJesus or Arache.

Upon returning to his office Cardarelli placed the box on his desk and began to investigate its contents. In addition to inspecting the bags of crack cocaine and powder cocaine, Cardarelli counted a total of $676 in one, five, ten and twenty dollar bills. Cardarelli also testified that he found two especially significant pieces of evidence folded in with the bills: a photograph of Wanda DeJesus and an identification card with Frank Arache's picture on it.

On cross-examination Cardarelli was asked to explain why his original report failed to indicate that he found the identification card inside the box. Cardarelli answered: "I made a mistake. It should have been put in there."

Providence police detective Jeffrey Ward, the second state witness, testified that he helped Officer Cardarelli disassemble the door and saw "numerous vials in plastic bags" and "some money" inside the box. Detective Ward testified that he did not see Officer Cardarelli seize the set of keys from Arache.

Police officer Robert Garvin, another member of the search team whose job it was to "secure the prisoners," testified that Detective Cardarelli entered the living room area (where Garvin had moved Arache so the kitchen could be searched) and that Cardarelli displayed the box to the defendants, Garvin and other detectives. Garvin testified that he saw only packages of drugs protruding from the box. He also testified that, with that single exception, Officer Cardarelli did not come near Frank Arache.

Subsequently, Garvin was recalled by the prosecution. This second time he modified a significant detail of his prior testimony explaining that he saw Cardarelli search Arache

[H]e reached into the defendant's pocket and he removed a set of keys, and with those keys he was able to unlock a chain lock which was through the front door, and we exited the building through—by that way.

On cross-examination Arache's counsel asked the following:

Q  Detective Garvin, do you remember just testifying about five minutes ago in this case?

A  That's correct.

Q  And do you remember being asked by me on four occasions whether or not Detective Cardarelli ever approached Mr. Arache?

A  Yes.

Q  And do you remember on each one of those occasions, under oath, saying no? You remember that?

A  I said no, that's correct.

Q  And do you remember that that one time when you left the company of Mr. Arache, you said he was with other detectives, you remember that?

A  That is correct.

Q  And I said was one of them Detective Cardarelli, and you said no?

A  Not at that time, no.

Q  You remember giving those answers under oath?

A  Yes, I do.

Q  Now, now you testify that you forgot about the keys, is that right?

A  That is correct.

Q  Did you have some conversations with anyone when you left the witness stand?

A  No, I didn't.

Following the conclusion of the government's case each defendant moved for judgment of acquittal. Both motions were denied.

Wanda DeJesus then took the witness stand and testified that she and Frank Arache came to Rhode Island for a vacation on July 7, 1989, and stayed with a friend on Eddy Street in Providence. On July 28 (the day they were arrested), they met a "young man" (whose name Ms. DeJesus could not remember) who invited them "to go out for a ride." They stopped to buy food and then went to 187 Bridgham Street, a place Ms. DeJesus had never before visited.

Shortly after their arrival at the Bridgham Street house, another man arrived to see the young man. The two went out, after telling DeJesus and Arache they would return shortly. Within a half hour the police arrived.

Ms. DeJesus gave testimony that contradicted the police version in two significant ways. First, she claimed that she saw the police seize her photograph, not from the box (as Officer Cardarelli testified), but from Arache's wallet. Second, DeJesus testified that the keys found by Cardarelli were on the kitchen table where their host Cedeno had left them, not in Arache's pocket.

Frank Arache was the next witness. Arache testified that he came to vacation in the United States planning "to spend some 25, 30 days with Wanda at Rosa's house" in Providence. He identified the young man they encountered on the street as Ciprian Cedeno, someone Arache knew from Puerto Rico. Arache otherwise confirmed the story told by DeJesus, stating that a police officer took his wallet which contained "[a]n I.D., a picture of Wanda, and a hundred something in dollars, and some personal things." Arache testified that he had no keys with him the day he was arrested.

Notwithstanding the defendants' testimony, the jury found Wanda DeJesus guilty of the conspiracy charge (Count I) and not guilty of the two substantive possession offenses (Counts II and III). Frank Arache was found guilty of all three Counts.

Both Arache and DeJesus moved for judgments of acquittal and each filed a motion for a new trial. On January 26, 1990, Judge Lagueux held a hearing on these motions and after reviewing the evidence introduced at trial, asserted that he did not believe the two defendants came to Rhode Island to vacation. Rather, he believed that they "were getting into the drug distribution business." Judge Lagueux also stated that he did not believe that Cedeno threw keys on the kitchen table: "I am satisfied with Cardarelli's testimony that he took those keys out of Arache's pocket and two of those keys fit the padlocks that were on the chaining device to the front door."

Then, addressing his concern about other parts of Officer Cardarelli's testimony, Judge Lagueux said:

Now, we heard some testimony from Cardarelli that when he brought that box down to the police station and he examined it, Arache's Puerto Rican I.D. card and a photograph of DeJesus fell out from the money that was contained in that box. I don't believe him. I don't believe Cardarelli's testimony in that respect. I think Cardarelli got that I.D. card and that photograph from Arache's wallet, and this was just a convenient way to tie up the case without much further investigation. That was a damning piece of evidence. Even disregarding that piece of evidence, and as a factfinder I would have disregarded it, I would still be satisfied that defendant Arache and defendant DeJesus had become the tenants of that apartment at 187 Bridgham Street and were going into the distribution of the cocaine found there.

I'm satisfied that the evidence that I outlined, and other evidence that I probably haven't mentioned, leads to the rea-

sonable conclusion that Arache had constructive possession of that cocaine in that box, in that door, of the closet in the bedroom, in that apartment.

Judge Lagueux denied all four post-trial motions.

Three days later Judge Lagueux notified counsel that he was reopening consideration of the four motions. At a hearing held the following day he explained why.

After I denied those four motions on Friday from the bench, I had many second thoughts about this case. I thought about it all weekend. Yesterday, Monday, I went through all of the evidence again, all of the physical evidence, the exhibits, and went through all my notes on this case. There are some troubling aspects about this case and I mentioned one of those troubling aspects on Friday.

First addressing the case against Wanda DeJesus, Judge Lagueux concluded that the only incriminating evidence linking her to the conspiracy was the photograph found in the box. He found that the photograph was insufficient to support her conviction on the conspiracy count, and therefore granted her motion for judgment of acquittal.

2. Judge Lagueux questioned why an experienced narcotics investigator would discard evidence found in a box with drugs.

3. With regard to the money, Judge Lagueux stated:

We had conflicting testimony from police officers on that subject. Cardarelli testified that he didn't see the money until he got back to the station and went through the drugs, the wad of bills, the I.D. card, and the photograph fell out. One other police officer testified that he didn't see any money in the box at the time that it was photographed and seen at the scene. But one other officer, Ward, testified that the money was sitting there right on top of the box when he saw it at the scene.

Interestingly, a small portion of the pouch can be seen in two of the photographs that are in evidence. No money can be seen. Cardarelli was recreating the scene in order to photograph it. He, in one photograph, shows the box being pulled out of the door and we can see into the box through the camera. We see all the glassine bags, and we see just the top of a pouch, a leather pouch it looks like to me. And no money.

4. Judge Lagueux made this statement about the wallet:

Turning to the evidence against Frank Arache, Judge Lagueux denied Arache's motion for judgment of acquittal and then said:

But, the motion for a new trial raises some issues in my mind. I said Friday from the bench that I didn't believe Detective Cardarelli's testimony, that he found Frank Arache's identification card and Wanda DeJesus' photograph among the bills in the box. This raises some very serious questions about tampering with evidence by a police officer. This is a veteran narcotics officer who, obviously to me, did manipulate the evidence in this case, and did so in order to create a closed case without doing further work to prove a case against these two defendants, especially, Arache.

He then identified other aspects of the case that were troubling to him: Cardarelli's testimony about the pouch;[2] conflicting evidence about the money that was supposedly found in the box;[3] the fact that Arache's wallet was discarded;[4] and the disappearance of money from Arache's wallet.[5] Judge Lagueux then stated:

This manipulation and tampering with evidence casts doubt on the rest of the evidence in this case. It's very trou-

Another disturbing aspect of the case is that Frank Arache's wallet was discarded. It nowhere appears in any of the inventories of property that were taken from him. I am satisfied he had a wallet on him, that he had his Puerto Rican I.D. card in it, and he had a photograph of Wanda in it. In fact, the photograph was cut down so it could fit into the wallet. That's obvious.

5. Judge Lagueux explained his concern about the money in Arache's wallet as follows:

Both Wanda and Frank Arache testified that there was a little more than a hundred dollars in the wallet. That raises a question as to what happened to that hundred dollars. I am satisfied he must have had some money on him because they had just gone out to buy groceries when the police started battering the front door and they just dropped those bags in the bedroom and never got them to the kitchen. I suppose there are two possibilities. One is that the money was discarded in some way, or the money was added to what was found in the box when the I.D. card and the photograph were conveniently placed there at the police station.

bling. Cardarelli said that he got the keys from Arache's pants pocket. No one else corroborated that until Garvin was called back and said he then remembered that the keys were taken from Arache's pocket. Robert Garvin had testified previously, fully, in direct and cross-examination, and then he was brought back, I believe, after a recess, to specifically testify about those keys. There is some doubt in my mind as to whether that testimony is accurate at this point. In short, I think this verdict was infected by this manipulation of the evidence, and I don't trust this verdict.

It is my function to see that justice is done in these cases. I can grant a new trial when I think there's been a miscarriage of justice. I am not sure there's been a miscarriage of justice, because as I've already indicated, in my own mind I am satisfied that Frank Arache went to live in that apartment either as a caretaker for the drugs or to be a retail dispenser of the drugs for somebody else.

The judge then explained his concern about the apartment that Frank Arache was visiting in Providence,[6] and his belief that Rosa Cintron (the woman DeJesus and Arache were visiting) was involved in the distribution of illegal narcotics. "But," Judge Lagueux added,

I can't allow a verdict to stand that is so infected by an obvious, to me, tampering of evidence.

Therefore, I think another Judge and another jury should have an opportunity to consider this matter, and I think the prosecutor should have an opportunity to consider this matter and undertake an investigation as to the reliability of this evidence, and make a decision as to whether Frank Arache should be retried.

So, I grant Frank Arache's motion for a new trial in this case, and I disqualify myself from being involved in the new trial since I have already made credibility

determinations here. As I say, I think a new Judge and a new jury should consider the case, if the prosecutor wants to pursue the matter.

The prosecution chose to pursue the two substantive claims against defendant Arache at a second trial. The case without objection was reassigned to Judge Torres. On the day the jury was empaneled, Arache asserted a series of motions, including: (a) a motion to dismiss based on prosecutorial misconduct and due process violations; (b) a motion to dismiss due to "prosecutorial vindictiveness;"[7] and (c) a motion to exclude the testimony of Officer Cardarelli and Detective Garvin. All of these motions were denied.

Evidence was presented at a two-day trial, most of which consisted of testimony from Officer Cardarelli and Detective Garvin. Their testimony was consistent with that given during the first trial. Frank Arache testified on his own behalf. In addition, testimony provided at the first trial by Wanda DeJesus and two other defense witnesses was read to the jury. The jury found Frank Arache guilty of both charges.

After considering arguments presented at a hearing held on August 23, 1990, Judge Torres denied Arache's motion for a new trial. He ruled that the evidence was sufficient to sustain the jury's verdict and that there had been no miscarriage of justice requiring a new trial. Judge Torres did, however, acknowledge serious concerns about some of the testimony he heard.

The real question in this case, the one that troubled Judge Lagueux and, frankly, troubles me, is whether the evidence has been tainted by some type of police misconduct. Frankly, I have some difficulty in accepting the testimony that Mr. Arache's photo identification and particularly the photograph of his wife was in

---

6. Specifically, Judge Lagueux stated:

   865 Eddy Street is a strange place.... It looked to me like that was sort of a jumping off spot to get into the drug business in this area.

7. In that motion, defendant argued that the federal prosecutor only acted against him after he was released on bail while a state-court trial was pending. Arache argued that this was an impermissible reason for assuming jurisdiction over the case.

the box containing the drugs. And it's a little bit difficult also in light of the evidence that the Court heard to accept that the keys were on Mr. Arache's person at the time the police entered the apartment. I'm not going to rehash all the reasons that I have to give me difficulty in accepting that version of the evidence. Judge Lagueux has alluded to them in his bench decision. I believe this Court has alluded to them on previous occasions in connection with a bail hearing for Mr. Arache and in passing on the Defendant's pre-trial motions. So, I would simply leave it that like Judge Lagueux, I have some reservations about that evidence.

On the other hand, the Court has to recognize that two juries have now considered this case and have reached the same result. They both concluded that Mr. Arache was guilty and in order to do so this Court is satisfied that they must have believed the testimony of the prosecution's witnesses on these two points that trouble the Court—the finding of the photo I.D. in the box containing the drugs and the finding of the keys to the apartment on Mr. Arache's person. Those two juries considered the evidence. And it seems clear to the Court that they must have believed the police witnesses and disbelieved Mr. Arache.

So, even though the Court has some reservations about that evidence, and might even have found differently than the jurors on the question, the Court's reservations are not sufficient to lead the Court to say number one, that it is certain enough that this evidence was tainted to warrant the granting of a new trial or two, that the Jury verdicts ought to be disturbed.

During the second trial the parties had agreed to the quantities of drugs found in

the box. The quantity of crack involved (180.1 grams), together with the appellant's criminal history category and other adjustments, translated to a base offense sentencing level of 34. Judge Torres rejected the government's request to add two guideline levels for obstruction of justice and rejected the defendant's request to subtract two levels for being a minimal or minor participant in the crimes. On Count I (possession with intent to distribute crack), Judge Torres imposed a sentence of 151 months, the shortest term possible within the range of sentences authorized for a level 34 offense. The same sentence was imposed on Count II (possession with intent to distribute cocaine). Judge Torres ordered that the two sentences be served concurrently.

## II. Discussion

Appellant presents his challenge to the convictions and sentence in five parts. We address each *seriatim*.

### A. Bad Faith

█ Appellant contends that it was plain error for Judge Lagueux to grant a new trial after finding "bad faith" on the part of the government's witnesses. Alternatively, he argues that Judge Torres "erred in considering the bad faith conduct of the government's witnesses as raising only credibility issues, and in not adopting the findings or rulings of law on the issue of bad faith made by Judge Lagueux."

We reject these arguments because the appellant's characterization of the record is flawed. While appellant asserts that Judge Lagueux found that Officer Cardarelli and Detective Gates acted in "bad faith," Judge Lagueux's statement makes clear that he made no such finding.[8] Plain-

---

8. Judge Lagueux's words follow:

There is another aspect of the evidence which troubles me. Cardarelli testified that there was a pouch in the box on top of the drugs. He testified that he discarded that because when he looked inside all that was there was blank paper and he didn't think it was relevant. He said he just tossed it on the bed. That testimony and that action is com-

pletely at odds with professional conduct by a police officer who takes a scene as he finds it and records it and keeps every bit of evidence because one cannot tell how it will fit in at some later time. That raises the question in my mind as to the significance of that pouch. There are several inferences I can draw. First of all, I can draw an inference that the money was in the pouch. Another inference I

ly, Judge Lagueux was troubled by Officer Cardarelli's testimony. It is equally plain, however, that the judge was not convinced that Cardarelli's testimony was wholly incredible or that his failure to save the pouch and paper evidenced a kind of "bad faith" that appellant contends would require an order of acquittal. This court is not in a position to recharacterize Judge Lagueux's conclusion in the way appellant suggests.

Unquestionably, the Due Process Clause guarantees a criminal defendant that his trial will "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984); *Neron v. Tierney*, 841 F.2d 1197, 1200 (1st Cir.1988), *cert. denied*, 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988). But appellant has failed to persuade us that either of his trials was fundamentally flawed.

Appellant's reliance on *United States v. Nichols*, 912 F.2d 598, 600 (2d Cir.1990), is somewhat mystifying. In the pertinent part of that case, defendant Claudia Mason (convicted for conspiracy to distribute and possession with intent to distribute crack) argued that she was denied due process when government officers seized cash from her safe-deposit box and then deposited it without recording the currency's serial numbers. In Ms. Mason's view, by failing to record the serial numbers, the government breached its constitutional duty to preserve exculpatory evidence. She therefore argued that the district court should either have declared a mistrial or told the jurors that they were free to draw the inferences they found appropriate from the government's failure to preserve the cash. The Second Circuit rejected these contentions, stating:

> Mason has offered no reason to believe that preservation of the cash would have yielded exculpatory evidence. It is diffi-cult to imagine how recording the currency's serial numbers could have assisted Mason's defense unless she herself had recorded such information for her legitimately earned funds. Even if the government had preserved the cash or recorded the serial numbers, Mason has presented no reason to believe she could have connected those funds to the legitimate sources she alleges. Mason has not established "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." In fact, the exculpatory effect of such evidence is so far-fetched that we decline to find any bad faith on the part of the officers who, in accordance with standard procedure, deposited the funds without recording the serial numbers.

*Id.* at 603 (citations omitted).

We find this appellant's arguments no more persuasive. Although Arache argues that we should distinguish the facts of his case from those of Mason's, we find more similarities than differences. Most importantly, like Claudia Mason, Frank Arache has failed to establish a reasonable probability that, had the pouch and the paper been retained and produced at trial, a different verdict would have resulted. Appellant's reliance on *Nichols* is therefore unavailing.

We agree with Judge Lagueux that Officer Cardarelli's failure to retain the pouch and paper did not comply with standard police procedure. Nevertheless, we are not persuaded that Cardarelli left that evidence behind in order to ensure appellant's conviction. Neither are we persuaded that Frank Arache's trial was rendered fundamentally unfair by Judge Lagueux's refusal to order Arache's acquittal or to prohibit Officer Cardarelli from testifying.

█ We also reject appellant's contention that Judge Lagueux should have ex-

---

can draw is that the documents in the pouch were to be used as a ledger as drug sales were made to record those drug sales, because I am absolutely convinced in this case that Arache didn't own those drugs. They were somebody else's drugs, and he was either there to dispense the drugs and keep track of his dispen-sations, or he was there simply as a caretaker while the real owner was away. It raises the specter that there were names on the papers in the pouch and that the pouch was discarded with the contents because it would cast doubt on the guilt of these two defendants who were caught in the place.

cised that portion of the testimony he found questionable. It is not within the province of the trial court to determine which portion of a witness' testimony is sufficiently credible to be presented to the jury. The jury is vested with the authority to decide whether to credit testimony, and the jury is free to accept some part of a witness's testimony while rejecting other parts of that same testimony. *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir.1986).[9] Two juries found the testimony given by government witnesses sufficiently credible to convict Frank Arache. This court does not have the authority to reverse those convictions simply because the two trial judges found less than credible some of the testimony upon which the conviction was premised.

■ Finally, appellant's "alternative" analysis is rejected. That analysis attacks Judge Torres' failure to adopt Judge Lagueux's findings as the "law of the case," and his decision to retry the matter as one involving a "freshly indicted" defendant. Assuming that the "law of the case" doctrine could apply in this situation, appellant's argument is premised on an erroneous view of the record. Judge Lagueux did not find the police officers' testimonies completely lacking in credibility. If he had, he presumably would have granted Arache's motion for judgment of acquittal. The "law of the case" appellant presses in this argument was not the law of the case found by Judge Lagueux. Accordingly, we reject appellant's first group of arguments.

## B. Judgment of Acquittal

Appellant next argues that Judge Lagueux erred in denying his motion for judgment of acquittal.[10] We find it difficult to summarize this circumvolutory argument and therefore quote from appellant's brief:

In explaining that the verdict could not be trusted, Judge Lagueux granted appellant's motion for a new trial, but de-

nied his motion for judgment of acquittal. This latter ruling was error, because in the context of the procedural peculiarities presented by this case, Judge Lagueux should have reexamined the case as of the conclusion of the United States' direct case, and then entered a judgment of acquittal on defendant's motion.

■ Assuming, without deciding, that appellant's argument is properly before us, for a number of reasons we reject it as framed. First, it is the law of this judicial circuit that, "[w]here the defendant makes a motion for acquittal at the close of the government's case and then again at the close of the defendant's case, ... the mid-trial motion [is] waived by the defendant." *United States v. Barnes*, 890 F.2d 545, 549 n. 4 (1st Cir.1989) (and cases cited therein), *cert. denied*, —— U.S. ——, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). In light of this rule, appellant's attempt to win reconsideration of the mid-trial motion must be rejected. Since defendant asserted the same motion at the close of his case, he waived his right to obtain review of the mid-trial motion, and Judge Lagueux was required to examine all the evidence submitted at trial.

We also disagree with appellant's construction of the record in this regard. Appellant asserts:

Influenced thusly by the testimony, [Judge Lagueux] awarded Mr. Arache a new trial while acquitting Ms. DeJesus. Clearly, Judge Lagueux's difference in treatment of the two (2) defendants before him, can be explained only by his disbelief of defendant, Arache's, explanation for his and Ms. DeJesus' presence at the apartment—a tale wholly unnecessary to relate, had there been no manipulation of the evidence and lying by police officers during the government presentation of its case.

We think it more appropriate to take Judge Lagueux at his word. In ordering the ac-

---

9. Of course, the trial judge may weigh the same evidence when considering whether to grant a new trial. *Id.; United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980).

10. Appellant asserted three motions for acquittal: the first was made at the close of the government's case; the second was made at the close of his case; the third was made after the jury returned its verdict.

quittal of Wanda DeJesus, Judge Lagueux stated that the only evidence linking Ms. DeJesus to the crimes charged was the photograph which Officer Cardarelli allegedly found in the box. As Judge Lagueux stated at the January 30, 1990, hearing:

I've reviewed the evidence and I concluded that I overlooked an important element of the indictment against [Wanda DeJesus] for conspiracy. The indictment charges her with conspiracy to distribute and to possess with intent to distribute more than 50 grams of crack, and a detectable amount of cocaine. The only evidence in this case which connects her with the crack and cocaine found in the box, in the door, in the closet, in the bedroom, was the fact that Officer Cardarelli testified that her photograph was found among the bills which totaled $676. Even accepting that evidence as true, the only reasonable inference that can be drawn from that evidence is that Arache put her photograph there. Therefore, viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the prosecution there is no evidence in this case that she conspired to distribute, or possess with intent to distribute, more than 50 grams of cocaine, crack cocaine. Therefore, I should not have let her case go to the jury at all. I can rectify that error right now. I hereby grant the motion of Wanda DeJesus for judgment of acquittal.

From this statement, it is apparent that Judge Lagueux treated the two defendants differently because Wanda DeJesus was convicted of only the conspiracy charge and because the only evidence that implicated her in the conspiracy was the picture in the box. We do not agree that the difference in treatment occurred because of Judge Lagueux's response to Frank Arache's testimony.

■ Moreover, we cannot find any infirmity in Judge Lagueux's decisions denying any of appellant's motions for acquittal. In deciding those motions, Judge Lagueux was "duty-bound to construe the evidence, together with all legitimate inferences to be drawn therefrom, in the light most fa-

vorable to the government." *Rothrock, supra,* 806 F.2d at 320. *See also United States v. Lamare,* 711 F.2d 3, 5 (1st Cir. 1983); *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). The credibility of witnesses could not be assessed in determining the sufficiency of the government's evidence. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978). So long as the evidence was such that a rational mind might fairly find guilt beyond a reasonable doubt, the jury's verdict could not be disturbed. *See Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979). *See also United States v. Gibson,* 726 F.2d 869, 872 (1st Cir.1984), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).

■ A review of the record reveals that Judge Lagueux fairly assessed appellant's arguments for acquittal three times. We find no reason to disturb his conclusions.

C. Double Jeopardy

■ Appellant next argues that his retrial violated the Double Jeopardy Clause of the Constitution since the evidence at the original trial was "legally insufficient" to sustain his conviction. In the case appellant cites—*Burks v. United States,* 437 U.S. 1, 4, 98 S.Ct. 2141, 2143, 57 L.Ed.2d 1 (1978)—a federal court of appeals reversed the conviction, finding that the prosecution had provided insufficient evidence to prove the crime charged. Instead of then ordering dismissal of the charges, the appellate court remanded the case for a new trial. The Supreme Court found the second trial unconstitutional, expressly holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." *Id.* at 18, 98 S.Ct. at 2150–2151. *See also Lockhart v. Nelson,* 488 U.S. 33, 39, 109 S.Ct. 285, 290, 102 L.Ed.2d 265 (1988).

*Burks* is of no assistance to appellant in this case because there was never a finding

that the evidence was legally insufficient to support Arache's conviction. We therefore reject appellant's reliance on the rule enunciated in *Burks*.

### D. Recusal

Appellant also contends that it was reversible error for Judge Lagueux to recuse himself from further proceedings after he ordered a new trial. Recusal is authorized by 28 U.S.C. § 455(a) which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In this judicial circuit, the issue has been further refined. The question here is

> whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man.

*United States v. Cowden*, 545 F.2d 257, 265 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977).

■■■ Appellant here made no objection at the time Judge Lagueux announced his decision to recuse himself. The recusal is only reversible then if it constituted "plain error." The plain error doctrine is derived from Rule 52(b), Federal Rules of Criminal Procedure, which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain errors are those which "undermine the fundamental fairness of the trial." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). The plain error exception is used "sparingly," only to prevent a miscarriage of justice. *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir. 1989). Under the circumstances presented in this case, we do not find that Judge Lagueux's decision to disqualify himself made appellant's second trial fundamentally unfair. Judge Torres was troubled by much of the same evidence that concerned Judge Lagueux. But like Judge Lagueux,

he did not find sufficient cause to invalidate appellant's conviction.

■■■ Appellant argues that Judge Lagueux deprived him of a fair trial by learning enough about the case to question the reliability of key testimony and then allowing the government an opportunity to redraft its case to persuade another judge and jury of appellant's guilt. While taken out of context, there appears to be some force to this argument, ultimately a criminal defendant has no vested right to have a particular judge preside at his trial. At any rate, in the context presented here, we conclude that appellant was afforded not only one, but two fair trials.

At the January 30, 1990, hearing, Judge Lagueux stated:

> I am not sure there's been a miscarriage of justice, because as I've already indicated, in my own mind I am satisfied that Frank Arache went to live in that apartment either as a caretaker for the drugs or to be a retail dispenser of the drugs for somebody else.

It appears to us that Judge Lagueux may have erred in calling for the new trial at all. The "remedy of a new trial is sparingly used, and then only where there would be a 'miscarriage of justice.'" *United States v. Rothrock*, 806 F.2d at 322 (quoting *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979)). Given Judge Lagueux's failure to find the first trial a miscarriage of justice, he likely should have let the guilty verdict stand and not have ordered a second trial. But any error in that regard did not cause appellant constitutional injury. To the contrary, it afforded him another opportunity to avoid conviction. He was not able to do so and, consequently, he is now faced with the formidable task of persuading this court that two juries and two judges wrongly decided his case. Under the circumstances presented here, we are not so persuaded.

### E. Joint Representation

■■■ Appellant's penultimate argument challenges Judge Lagueux's failure to investigate the possibility of a conflict of interest between Frank Arache's trial coun-

sel (David Cicilline) and trial counsel for Wanda DeJesus (John Cicilline). The Cicillines are father and son. Appellant asserts that they are associated in the practice of law at their Providence, Rhode Island, offices. Since appellant did not raise this challenge below, we would review it for plain error pursuant to Rule 52(b); that is, we only find reversible error if appellant's trial was rendered fundamentally unfair because of a conflict that infected the representation he received. Notwithstanding the standard of review, even if we found a defect, the remedy would be a new trial. That is exactly what Arache received. Even he must acknowledge that his second trial was conflict free. Therefore, appellant's assignment of error comes to nothing.

### F. Sentence

Appellant also challenges Judge Torres' refusal to reduce his sentence, arguing that the evidence establishes only that he was a minimal or minor participant in the crimes for which he was convicted.

United States Sentencing Guidelines ("U.S.S.G.") § 3B1.2 allows sentencing judges to decrease the offense level applied to a particular crime if the defendant was a "minimal," § 3B1.2(a), or a "minor," § 3B1.2(b), participant. The minimal participant subsection "applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment. (note 1).[11] A minor participant is defined as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* (note 3). Judge Torres considered both options and concluded that no deduction was required.

■ Appellant bears a heavy burden in attempting to persuade us that Judge

Torres erred in this regard. We will reverse the district court's finding that a defendant is not a minimal or minor participant only if it is clearly erroneous. *United States v. Paz Uribe*, 891 F.2d 396, 399 (1st Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990); *United States v. Wright*, 873 F.2d 437, 444 (1st Cir.1989). Appellant has not carried that burden here.

■ In fact, there was not a great deal of evidence linking Frank Arache to the drug trafficking crimes for which he was convicted. But the paucity of evidence does not compel the conclusion that Frank Arache was only minimally involved in the crimes. Two juries and two trial judges were convinced that Arache possessed crack and cocaine with intent to distribute them personally committing each and every element of the charged offenses. Given that conclusion, we find it impossible to fault Judge Torres for refusing to find Arache a minimal or minor participant in those crimes. We find no clear error in Judge Torres' conclusion that Frank Arache was not substantially less culpable than the average possessor of crack or cocaine.

Accordingly, the judgment of the district court is *affirmed.*

***

11. The commentary also provides an indication of the way in which the drafters intended the minimal participant subsection to be applied:
   It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.
U.S.S.G. § 3B1.2, comment. (note 2).