954 F.2d 1263
 34 Fed. R. Evid. Serv. 1264
 COAL RESOURCES, INC.; No. 11 Coal & Construction, Inc.;
Green Mountain Coal Company and Liquidating Trust,
Plaintiffs-Appellees, Cross-Appellants,
v.
GULF & WESTERN INDUSTRIES, INC., Now named Paramount
Communications, Inc.; the New Jersey Zinc Company; Jersey
Kentucky Coal Company, Inc.; Virginia Met Coal Company,
Inc., Defendants-Appellants, Cross-Appellees.
 Nos. 90-3989, 90-3990.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 19, 1991.
Decided Jan. 29, 1992.
Rehearing and Rehearing En Banc Denied
March 13, 1992.
Order Clarifying Opinion April 22, 1992.
 
 Vincent B. Stamp (argued and briefed), Nancy C. Cody, Dinsmore & Shohl, Cincinnati, Ohio, James K. Robinson (briefed), Honigman, Miller, Schwartz & Cohn, Detroit, Mich., and Catherine M. White, Cincinnati, Ohio, for plaintiffs-appellees, cross-appellants.
 Gerald W. Simmons, Jeffrey A. Lydenberg, and Jacob K. Stein (argued and briefed), Thompson, Hine & Flory, Cincinnati, Ohio, for defendants-appellants, cross-appellees.
 Before KENNEDY, RYAN and BOGGS, Circuit Judges.
 KENNEDY, Circuit Judge.
 
 
 1
 Defendant Gulf and Western ("G & W") appeals from a jury verdict for plaintiff Coal Resources, Inc. ("CRI") in CRI's diversity breach of contract action against G & W raising numerous evidentiary issues.[1] CRI cross-appeals the District Court's denial of pre-judgment interest. We REMAND to the District Court for a new trial unless CRI remits $226,563 of the awarded damages.
 
 I.
 
 2
 This is the third time this case has been tried and appealed to this Court. The case has been considered on original appeal, a rehearing of that appeal, an appeal following a second trial and now this appeal following the third trial. The basic facts of the case were adequately related in the opinion addressing the second appeal and we quote from that case:
 
 
 3
 Coal Resources, Inc. (CRI) obtained leases on coal properties in Virginia and Kentucky and began mining operations in the early 1970s. The leases required CRI to "diligently mine" the properties and to pay minimum royalties to the lessors regardless of the amount of coal mined. In 1975, CRI entered into negotiations for the sale of its assets to defendant Gulf & Western (G & W). On July 11, 1976, the parties reached an agreement. CRI's assets were transferred to G & W subsidiaries Virginia Met Coal Company and Jersey Kentucky Coal Company. G & W paid CRI $2.1 million, promised to pay $500,000 one year after the date of the sale on a promissory note CRI owed to a bank, assumed CRI's equipment debt of $1.7 million, and agreed to pay CRI 2.8 times any annual adjusted net profits ("the multiple") of Virginia Met Coal Company for the two years following the sale after deduction of certain amounts already paid and with a maximum limit of $11,666,000. In a separate agreement G & W also assumed CRI's obligations under the leases.
 
 
 4
 After acquiring the leases, G & W was unable to mine the leased property profitably. Eventually G & W lost the leases either through failure to pay minimum royalties to the lessors, through litigation settlements with its contract miner, or through voluntary surrender. No money was ever paid to CRI under the multiple because Virginia Met Coal operated at a loss. CRI then brought suit.
 
 
 5
 In 1981, following the first trial in this case, the jury found G & W liable for breach of contract, promissory fraud, and securities fraud. The jury awarded CRI more than $17 million in compensatory damages, and more the $11 million in punitive damages and attorneys fees. The trial court ordered a remittitur to $12,050,000 and granted G & W's motion for judgment notwithstanding the verdict on the securities claim.
 
 
 6
 On appeal, this court affirmed originally the judgment dismissing the securities law claim, reversed the judgment on the other claims and remanded those claims for a new trial. CRI then filed a petition for rehearing which was granted. Following supplemental briefing, the original hearing panel affirmed the j.n.o.v. on the securities law claim, reversed the judgment for CRI on the promissory fraud claim, vacated the judgment for CRI on the contract claim, and remanded for a new trial [in that claim]. Coal Resources, Inc. v. Gulf & Western Indus., Inc., 756 F.2d 443 (6th Cir.1985).
 
 
 7
 Coal Resources, Inc. v. Gulf & Western Indus., Inc., 865 F.2d 761, 764-65 (6th Cir.1989). At the second trial the jury again found in favor of CRI on the contract claim and returned an award of $7,850,000.
 
 
 8
 On appeal, this Court reversed the judgment of the District Court on the contract claim and once again remanded the case for a new trial. The Court found that the testimony of plaintiffs' expert witness was too speculative in some respects to be admissible and that the defendants had been unfairly treated by the denial of a witness. At the third trial, the jury again found for CRI on the contract claim, awarding damages of $8.9 million. At this third trial, G & W admitted breach of the contract to mine diligently. Thus, the only issue tried was damages.
 
 
 9
 G & W appeals claiming that CRI openly defied this Court by basing its case on the same testimony and expert this Court found to be speculative in 1989. Coal Resources, 865 F.2d at 761. G & W claims that CRI's testimony is inadmissible speculation under the "law in the case" doctrine and that as a result final judgment should have been rendered for G & W. G & W further contends that the trial court erred in excluding evidence of coal prices presented by its witness. CRI cross-appeals claiming that the trial court erred in denying pre-judgment interest.
 
 II.
 
 10
 We first must decide whether the District Court and the parties in this case allocated appropriate weight to this Court's previous holdings. G & W asserts that CRI ignored the 1989 ruling of this Court which held that the expert testimony given by Coal Resources' experts, primarily Stonie Barker, was too speculative to be admissible. Coal Resources, 865 F.2d at 770. G & W argues that admission of testimony by the same expert at the retrial openly defies the previous rulings. Further, G & W contends that it is "law of the case" that CRI's damage theory is inadmissible speculation. During the course of the third trial, the defense objected to the testimony by Stonie Barker. When denying the motion, the District Court stated:
 
 
 11
 I acknowledge that the Court of Appeals rejected Mr. Barker's testimony as too speculative to be admissible on retrial. The Court finds that this is a different trial than the one perceived by the Court of Appeals in the last case. There are many--there have been some changes in it, particularly the stipulations of the defendant.
 
 
 12
 Joint App. at 2487.
 
 
 13
 The law of the case doctrine "precludes this Court from rehearing a previously decided issue unless one of three 'exceptional circumstances' exists [including] that the evidence in a subsequent trial was substantially different." 865 F.2d at 767 (quoting Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed.Cir.1985). Thus, CRI may use similar testimony at the second trial where that testimony is now supported by new evidence presented by either the plaintiffs or defendants. The defendants' position on many issues did change since the earlier trials. Although G & W do not agree with CRI on every issue, the disagreements between the parties now center on five issues.[2] Clearly, CRI still must provide some basis from which a jury could find that the witness' estimates had foundation and the opinions were grounded in reason. That the previous testimony was speculative does not now preclude Barker's testimony where a foundation for it is supplied. Barker's testimony is admissible since both G & W and CRI submitted substantially different testimony. G & W argues that this exception should not apply because Stonie Barker's testimony has remained the same. It is true that Barker's opinion is largely the same. However, there is no requirement that Barker's specific testimony must change; a change in the other testimony and evidence presented at trial which provides support for Barker's testimony removes the impediment of speculation.
 
 III.
 
 14
 This Court's review of a civil jury verdict must determine if the verdict "is sufficient to support the judgment, [and] follow the traditional rule of viewing the evidence in the light most favorable to the prevailing party." Coal Resources, 865 F.2d at 767. Damages which are remote or speculative are not permitted. Grantham & Mann, Inc. v. American Safety Prods., Inc., 831 F.2d 596, 601 (6th Cir.1987). Further, "[o]nce the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." Id. at 602.
 
 
 15
 The defendants continue to complain that several of the assertions made by Barker and other plaintiff witnesses amount to inadmissible speculation. A Study Team ("Team") commissioned by G & W presented a property development report dated February 19, 1990. This report together with the testimony and evidence submitted by both sides narrow the areas of disagreement to five. We limit our discussion to issues still subject to disagreement which are not clearly waived by the defendants.
 
 
 16
 A. Percentage Of Coal Which May Be Sold As Metallurgical Coal
 
 
 17
 This Court noted at the last appeal that the percentage of steam coal and metallurgical coal produced by the mine was material. Coal Resources, 865 F.2d at 771. G & W warrants that CRI has failed to show any factual basis in the record for Barker's assumption that more than 60% of the mined coal could be sold in the metallurgical market. Barker's plan assumed that the mix of coal sold during the multiple years would be 80% metallurgical and 20% steam. G & W's plan allows that while the coal may be produced at that ration, only 60% of the coal could be sold as metallurgical coal.[3] G & W believes that the 80%/20% sales ratio could not be achieved until the mine was established as a reliable producer of metallurgical coal and the new coal plant was completed. The testimony of G & W's experts provides credibility to Barker's assumed coal mix. In addition, subsequent to the last appeal Humphreys Enterprises opened up deep mines on the Kelly seam on this property and thus new information is available concerning the type of coal mined and the time needed to mine the coal. The testimony of all the witnesses in this area provides an adequate foundation for the jury to infer that 80%/20% was a reasonable ratio to use in determining damages.
 
 B. Prices
 
 18
 In his mining plan, Barker assumed selling prices for metallurgical coal of $44.00 and $42.00 for the first and second years of the multiple respectively. He assumed a price of $34.00 for steam coal both years of the multiple. Defendants assert that there is no evidence that these prices could be obtained. Rather, the Team report for G & W indicated metallurgical coal prices of $34.00 and $35.00 for multiple years and a steam coal price of $24.00. Various defense witnesses testified concerning other prices obtained for specific sales. G & W argues that Barker ignores the actual sales prices obtained for the best coal on the property and used a higher price in his projections than could have been possibly attained.
 
 
 19
 CRI presented two experts, Stonie Barker and Charles P. Eddy, on the issue of coal sale prices during the multiple years. Defendants do not challenge either expert's qualifications to testify on this issue. Both Barker and Eddy declared that their price estimates were based on personal knowledge of coal prices during the multiple years and gave similar price estimates.[4] Barker also introduced and relied on a long-term contract report of his former employer, Island Creek, that showed negotiated prices for metallurgical coal which went into effect April 1, 1976. Joint App. at 2901, 4351. Barker's steam coal price estimates were based on personal recollection and further supported by a letter from Lloyd Evans, president of Island Creek, outlining steam coal prices during 1975-1977.
 
 
 20
 Our decision on the last appeal criticized Barker's testimony on prices because they were based on a small number of small sales. During the third trial, however, Barker's testimony was reinforced by Eddy's testimony. Eddy based his estimates on large purchases his company made during the multiple years. This testimony, combined with Barker's expanded testimony, can no longer be considered speculative. We believe that a jury could reasonably use Barker's price estimates in determining damages.
 
 
 21
 G & W also protests the trial court's refusal to allow G & W to present evidence of spot market prices during the multiple years. Stanley Ringstaff, who testified about large numbers of spot market sales in which he had participated, was prepared to substantiate his testimony with notes he had taken concerning the sales. The District Court judge determined that the failure to admit Ringstaff's documentation was harmless error. (Ruling on Defendants' Motion for J.N.O.V. and/or New Trial.) A variety of witnesses gave evidence that sales prices ranged from $38.00 to $39.00 for metallurgical coal. These witnesses thus provided support for Ringstaff's estimates. We believe that this supportive testimony makes the failure to admit the evidence on prices harmless error.
 
 C. Return On Investment
 
 22
 During his testimony, Stonie Barker testified that 10 to 20 percent constituted a reasonable return on investment for a mine. Barker additionally testified that in an inflationary period returns of greater than 20% would not be unreasonable.[5] G & W argues that Barker's mine plan will result in a 100% after tax return on investment for the first year of the multiple. Defendants believe that such a return exemplifies the speculative nature of Barker's testimony.
 
 
 23
 Defendants' argument is based on an improper calculation of the return on investment. G & W's calculation assumes that they incur no obligation to pay under the multiple. If the estimated profits under Barker's mine plan were considered additional capital investment, the return on equity under Barker's plan would be 30%. Presented together with the proper support, this return on equity could be viewed by the jury as reasonable.
 
 D. Days Worked
 
 24
 In his mine plan, Barker assumed 262 working days in the first year and 191 days in the second year. No other expert, including CRI's expert Eddy, assumed this high of a number of workdays. Documentation provided by the other experts, both G & W's and CRI's, indicate that mines in operation during this time averaged about 230 days.[6] CRI defends Barker's testimony by noting that the dispute really centers on whether the miners would have worked every other Saturday. The number of "down days" for unexpected events such as severe weather and interruptions outlined in both Barker's and the Team's plans differed by only five days. A jury could have reasonably accepted CRI's argument that Virginia Met employees would have mined every other Saturday. We agree therefore with the District Court finding that the testimony and calculated damages were not speculative based on this issue.
 
 E. Production Commencement
 
 25
 Barker's mine plan assumes reduced production for the first month and then full scale production for the remainder of the multiple. G & W asserts that additional time would be necessary before deep mining would be possible. This time would be used to obtain permits, install electricity, and conduct various studies. Witnesses Stagg and Peake testified that there was ready access to 1,150,000 tons of deep minable coal, that engineering companies had surveyed the property and prepared a mining plan prior to closing, and that a report had been prepared outlining the feasibility and estimated costs of the mining. Stagg also testified that deep mining can begin during exploratory mining. This testimony, combined with other expert opinions, properly presented an issue which the jury had ample evidence to decide.
 
 F. In-House Sales Force
 
 26
 Barker's mining plans call for the coal to be sold through an in-house sales force. G & W defense expert, Stanley Ringstaff, testified that smaller businesses generally sell through brokers until they are established. However, Ringstaff further stated that "[A]s far as the conclusion of the team was that we would, after we built up production, that we would work toward an in-house sales force." G & W's other expert Evans testified that at the beginning of the multiple, G & W was selling through Vice President Cecil Peake and that such a system was common practice in the coal industry. Evans' statement is supported by the Team report which stated that in-house sales were normal in the coal industry. These statements by defense experts lend support to Barker's assumptions and form a basis for a reasonable decision by the jury.
 
 G. Construction Of The Preparation Plant
 
 27
 A coal preparation plant washes and cleans deep mined coal prior to sale. Both the defendants and plaintiffs agree that the construction of a new coal washing facility was necessary to diligently mine the coal. The parties disagree, however, on the type of plant and the time necessary for construction. These factors are critical in the calculation of profit during the multiple years since the speed with which a plant is constructed and the associated cost directly impacts income during the multiple years. Defendants' expert, Leo Haanskorf, asserts that a three-stage plant, with three separate cleaning systems, would have been appropriate. This plant would cost $1.5 million more that the heavy media cyclone modular plant suggested by Barker. The three-stage plant would also take four months longer to build than the modular plant. We believe that the issue of what type of coal preparation plant should be built was properly presented and argued to the jury. We do not believe, however, that CRI's expert was properly qualified to testify as to the cost of the chosen plant.
 
 
 28
 G & W contends that Barker is not qualified to testify concerning the cost associated with the construction of a coal preparation plant. Federal Rules of Evidence define an expert witness as one whose "knowledge, skill, experience, training, or education" gives the witness scientific, technical or specialized knowledge which will assist the trier of fact. Fed.R.Evid. 702. Barker was the Chief Executive Officer of Island Creek Coal. There is no dispute that he is qualified to give expert testimony about the development and mining of the property purchased by G & W. His qualifications as an expert on property development, however, do not automatically qualify him to testify concerning the costs and appropriateness of coal preparation plants. Amato v. Syntex Laboratories, 917 F.2d 24 (6th Cir.1990). CRI asserts that Barker approved and reviewed all coal preparation plant construction and modification during his tenure at Island Creek and should be considered qualified. Review of plans and budgets prepared by others differ substantially from the preparation and design of the plans. Thus, Barker could be considered qualified to choose the type of plant but this may not qualify him to give an expert opinion about the associated cost.
 
 
 29
 Barker's testimony reveals that although he had been involved with the plant construction plans while Chief Executive Officer at Island Creek, "I had people on the staff who would make analysis of the kind of preparation plant you want for a given set of conditions, and of course they would submit those plans and the capital budget to me." Further, Barker admitted, in reply to the question of whether he considered himself a coal preparation plant expert, "I leave that up to the people." The modular single stage plant Barker recommends in his report was a newer innovative type plant in 1976. Barker states in his testimony that Island Creek Coal did not complete a similar plant until 1977. That plant was only used as a temporary facility and did not have the size or capacity of the plant Barker recommends in his report. There is no other evidence in the record that Barker was involved with the construction of another single stage coal preparation plant.
 
 
 30
 Barker acknowledged that although he selected the plant type G & W should have used, he relied on others for the design and cost estimates for the plant. Barker supplied no records or documentation to support the cost estimates and none of the people who supplied the information appeared as witnesses.[7] Because of these deficiencies, we find that Barker was not qualified to testify concerning the cost of constructing a coal preparation plant and the CRI has failed to otherwise prove the cost of the plant.
 
 
 31
 We do not believe a new trial is needed. However, to rectify the error in permitting Barker to express an opinion on the cost of such a plant, a decrease of the damage award to CRI is necessary. Haanskorf testified that Mr. Barker's estimates for the heavy media cyclone plant underestimated the costs by $725,000. Joint App. at 3401. If this amount is added to Barker's estimate, the new plant cost would be $2,025,000. Adjusting this plant cost for depreciation and interest, $226,563 should be subtracted from mine income in Barker's prepared reports.[8] Thus, a remittitur of $226,563 is warranted. An appellate court may permit or order a remittitur if the proper reduction to damages is ascertainable from the record. Hansen v. Boyd, 161 U.S. 397, 16 S.Ct. 571, 40 L.Ed. 746 (1896); Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (6th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962). This power to reduce a verdict is conditional on the consent of the prevailing party. Washington and Georgetown R.R. Co. v. Harmon's Adm'r, 147 U.S. 571, 13 S.Ct. 557, 37 L.Ed. 284 (1893). We therefore remand this case for a new trial unless CRI remits $226,563 of the verdict. If such an amount is remitted, the verdict will be affirmed.
 
 IV.
 
 32
 The District Court denied a motion by the plaintiffs for an award of interest on the damage verdict. This Court can reverse this decision only if it finds an abuse of discretion. Coal Resources, 865 F.2d at 776. We find no such abuse.
 
 
 33
 CRI argues that G & W's position in the 1990 trial contradicts their positions in the earlier trials, that their earlier claims were therefore false and frivolous, and that pre-judgment interest should be awarded as a sanction. G & W did change its position as to whether its mining efforts could be considered diligent, but only after submitting the data to a new set of experts and receiving a different opinion. No evidence was produced which indicated that G & W knew that their mining was not diligent during the first trials. We find that the evidence does not clearly indicate conduct sufficient to require payment of pre-judgment interest and affirm the District Court's decision denying the motion for pre-judgment interest.
 
 V.
 
 34
 For the reasons stated above, we REMAND the decision of the District Court for a new trial unless consistent with this opinion plaintiffs accept a reduction of $226,563 from the damages awarded. No costs are awarded since both parties have prevailed in part.
 
 
 35
 RYAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 36
 The temptation is great to go along with an appellate judgment that, after three appeals, essentially affirms an $8.9 million jury verdict save for an ordered remittitur of $226,563. Unfortunately, in my judgment, the court's decision to require the plaintiffs to accept a remittitur or endure a fourth trial is mistaken.
 
 
 37
 The court's decision to reject Stonie Barker's expert opinion testimony because he "was not qualified to testify concerning the cost of constructing a coal preparation plant," suggests a misunderstanding of the record and, respectfully, a misunderstanding of the correct application of Fed.R.Evid. 702 and 703.
 
 I.
 
 38
 The standard of review of a trial court's decision to admit expert opinion testimony under Fed.R.Evid. 702 is whether the trial court abused its discretion. Mannino v. Intern. Mfg. Co., 650 F.2d 846 (6th Cir.1981). We are not free to substitute our judgment for the district court's concerning the expert's qualification if there is any evidence in the record to support the trial court's ruling that the witness was qualified under Fed.R.Evid. 702 to render the proffered opinion.
 
 
 39
 The asserted "factual" bases for the majority's conclusion that Barker was not qualified to estimate the cost of building a coal preparation plant are (1) that Barker, while qualified to testify concerning the type of preparation plant necessary, had no personal knowledge of the cost of a preparation plant, (2) that he merely relied upon the opinion of others for the "design and cost estimates for the plant," and (3) that he "supplied no records or documentation to support the cost estimates...." There is evidence in the record, however, that contradicts each of those three conclusions.
 
 
 40
 The "legal" basis for the majority's conclusion that Barker's opinion was inadmissible is the court's understanding of Fed.R.Evid. 702. Properly applied, however, Rule 702, in conjunction with Rule 703, does not preclude Barker's opinion, and that is so even if the majority's three mistaken factual conclusions were correct.
 
 II.
 
 41
 To appreciate the bases upon which the district court, in the exercise of its discretion, determined that Barker was qualified, it is necessary to recall that the purpose of his testimony was to describe a hypothetical diligent mining plan and, in doing so, to express an opinion as to the net profit such a plan, if executed, would likely accrue to CRI. Barker's opinion was the heart of CRI's case. The cost of the coal preparation plant was merely one component, and mathematically a relatively minor one at that, of Barker's diligent mining plan.
 
 
 42
 The detailed numbers that comprise this plan are found in plaintiffs' Exhibit 1113, a fourteen-page report Barker prepared in September 1989. In that report, Barker analyzed the cost of necessary capital improvements, the cost of operating the mines, the level of production, and the sales price of the coal that would be extracted; all component parts of Barker's opinion of what would constitute a diligent mining plan. Based upon this plan, Barker determined that the amount due CRI if G & W had diligently mined the land in question was $8,999,541.89. If that number sounds familiar, it should; it is the precise amount the jury awarded CRI.
 
 
 43
 As part of his opinion, Barker included, among other things, cost estimates of the necessary capital improvements. These cost estimates appear in a schedule of depreciation on the capital improvements necessary to the mining plan. One such improvement was the new coal preparation plant which Barker initially estimated would cost $1.3 million and later estimated would cost $1.2 million.
 
 
 44
 The majority's first criticism of Barker's testimony is that Barker was not qualified, based on his prior experience, to express an opinion about the cost of a preparation plant. This conclusion ignores the relevant portions of Barker's testimony. Barker testified:
 
 
 45
 During the years I was with Island Creek, we projected and built, constructed and built probably a dozen or more preparation plants and probably a dozen or more modifications in other plants.... We built new plants, a dozen or more new plants from scratch. I reviewed plans, budgets, capital, money received to do these things.
 
 
 46
 (Emphasis added.) Barker continued, reaffirming his central role in the development of Island Creek's coal preparation plants: "I approved the plans for doing so and the money it took required to do them."
 
 
 47
 In support of its conclusion that Barker was not qualified, the majority opinion quotes a portion of Barker's testimony, apparently seeking to prove that Barker merely rubber-stamped plant proposals submitted to him. According to the majority opinion, Barker stated:
 
 
 48
 I had people on the staff who could make analysis of the kind of preparation plant you want for a given set of conditions, and of course they would submit their plans and the capital budget to me.
 
 
 49
 Barker's complete answer, however, part of which is omitted from the majority opinion is, as follows:
 
 
 50
 ... and of course they would submit the capital budget to me and I would either agree or disagree with them on them.
 
 
 51
 (Emphasis added.)
 
 
 52
 Indisputably, Barker's testimony as to his experience at Island Creek is evidence in the record that supports the trial court's judgment that the witness was qualified under the terms of Fed.R.Evid. 702 to render the proffered opinion. During his years as president of Island Creek, Barker acquired the "knowledge, skill, experience, [and] training" to evaluate the proper cost of a preparation plant. While G & W attempted, upon cross-examination and otherwise, to contradict that testimony, the trial court, manifestly relying on the witness' statement that he had the skill and experience to render such an opinion, found that foundation legally adequate and permitted the witness to give his opinion. Because there is a basis in the record for the trial court's conclusion that Barker was qualified to render the opinion, this court is not free to find otherwise, and is not justified in finding, as it has, that the district court abused its discretion in allowing Barker to express his opinion.
 
 
 53
 The majority's second criticism of Barker's testimony is that he relied on others for his estimate of the plant cost. This conclusion is mistaken. Barker testified as to how he arrived at the $1.3 million figure:
 
 
 54
 [Q.]And last September, on a version that had a date September 26, 1989, the $1,300,000 figure was shown for the prep plant?
 
 
 55
 A. Yes.
 
 
 56
 Q. Where did that figure come from at that time?
 
 
 57
 A. It came from me.
 
 
 58
 Q. Was it a figure that you had developed on your own or had you developed it through conversations with other people?
 
 
 59
 A. I had to develop that figure. I developed it on my own. But there is no way I could remember what all the prices, the construction prices and the prices for the tills were when I put that together, and I had to use--I had to call. I made a lot of calls to different people to find out what construction costs were, the price of materials, what these screens, the items on the plant, but I'm the one that's responsible for putting the 1.3 million on it.
 
 
 60
 (Emphasis added.)
 
 
 61
 Barker's testimony, "I had to develop that figure. I developed it on my own," should have been the beginning and the end of this court's inquiry into whether the district court abused its discretion in allowing Barker to express an opinion as to the estimated cost of the preparation plant. To be sure, Barker testified that he consulted at least five people to "confirm" the cost of various components of the coal preparation plant. He was emphatic, however, that the estimate was his. The determination of the credibility of Barker's statement, in light of all the evidence, was for the trial court, not this court.
 
 
 62
 Two months before trial, Barker made a second estimate of the cost of the coal preparation plant which he reduced to writing in a document entitled "Capital Cost Estimate for Preparation Plant and Surface Facilities." Exhibit 1114. This second estimate fixes the preparation plant cost at $1.2 million. As to this new revised estimate, Barker testified as follows:
 
 
 63
 Q. Well, my question, Mr. Barker, was, when did you finalize your opinion on those costs figures as they appear on Exhibit 1114?
 
 
 64
 A. I'm going to say June or July. The final costs there and I had $91,000 left over and I just put it in as a contingency and the number 2,175,000 is what I used in earlier estimates.
 
 
 65
 Q. Now, on the black box itself, you've got what figure down on your 1114?
 
 
 66
 A. 1,200,000.
 
 
 67
 Barker then explained the difference between his two estimates:
 
 
 68
 Q. The last page of your computer printout mine plan [Ex. 1113]. I think is the capital cost, page 14?
 
 
 69
 A. Yes, it is a million, three and it's one of the earlier estimates I made that I said that I ballparked, and when I got the final fine tuning I made the adjustments, and I'm the one that's responsible for putting the 1,200,000 and I had about 100,000 left and there is 91,000 showing there as the contingency and the capital cost, and I kept it in the capital account and didn't change the overall totals.
 
 
 70
 (Emphasis added.)
 
 
 71
 The majority apparently misunderstood one aspect of this "fine tuning" when it concluded that Barker relied on others for his estimate. The "fine tuning" involved getting a "turnkey cost estimate" for the plant from a consultant, Richard Terry. Barker testified that he sought Terry's opinion concerning the design and the turnkey costs of the plant in order "to confirm" Barker's own estimate of the cost. Barker testified:
 
 
 72
 The black box itself, the final costs was done by Richard Terry. He confirmed. I had originally ballparked it. He confirmed what the turnkey cost was.
 
 
 73
 (Emphasis added.)
 
 
 74
 The court's conclusion ignores Barker's testimony that he supplied Terry with the data to enable Terry to produce a schematic design of Barker's conception of the preparation plant and a confirming estimate of the total capital improvements cost. Barker testified:
 
 
 75
 I told him the kind of plant I wanted and I said I wanted two heavy media cyclones and related facilities to go into it.... [H]e positioned them, put them in the circuits and put it together. I didn't tell him how to design it.
 
 
 76
 Despite Barker's testimony that he developed his initial estimate on his own and that he did not seek Terry's opinion until July 1990, immediately before trial, and then merely "to confirm" what Barker himself had "ballparked," the majority opinion holds that "[Barker] relied on others for the design and cost estimates for the plant." Plainly, that appellate finding of fact rejects Barker's testimony and the district court's implicit finding that Barker's testimony supplied a valid basis for his qualifications to render opinion testimony.
 
 
 77
 The majority's third criticism is that Barker produced no documentation for his estimate. This criticism too is contradicted by the record. Barker produced several documents to support his estimate, two of which were created by Terry: the first was a letter describing the "Flowsheet Design Data" Terry used in his estimates of "the turnkey cost to design, engineer, fabricate, erect, and commission a heavy media coal preparation plant"--a cost he estimated at $1,430,500[1]--and the second is a schematic flowsheet depicting the circuitry of the preparation plant. Both documents were received in evidence as plaintiffs' Exhibits 1119 and 1115, respectively. In addition to these documents, Barker also produced Exhibit 1113, his fourteen-page report, and Exhibit 1114, a breakdown of the costs for new mine facilities.[2]
 
 
 78
 Thus, it ought to be indisputable that Barker testified 1) that he was qualified to estimate the cost of a coal preparation plant; 2) that he did so twice in connection with the diligent mining plan he developed for this case; 3) that his estimate of the cost of the plant was documented in Exhibits 1113 and 1114; and 4) that the cost estimates made by the consultant Terry (Exhibit 1119) were made nearly a year after Barker's original estimate and, indeed, were made at Barker's request.
 
 
 79
 On such a record, it cannot fairly be said, unless this court substitutes its credibility determinations for those of the trial judge, that the trial judge abused his discretion in finding, as a threshold matter under Fed.R.Evid. 104(a), that Barker was qualified to express his opinion on the cost of a coal preparation plant.
 
 III.
 
 80
 But even if the record did not demonstrat e that Barker was qualified to estimate the cost of the coal preparation plant, his opinion of what constituted a diligent mining plan, of which the preparation plant was merely one component, was nevertheless admissible.
 
 Federal Rule of Evidence 703 states:
 Bases of Opinion Testimony by Experts
 
 81
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 82
 The admissibility of an expert's opinion under Fed.R.Evid. 703 does not depend upon the witness having personal knowledge concerning the details of every constituent element of the opinion. For example, a physician's expert opinion concerning the permanency of a bodily injury is not inadmissible because the physician relies for his opinion upon the opinion of a radiologist as to the significance of what the radiologist finds in an x-ray, or upon the opinion of a pathologist as to the significance of tissue deterioration, or upon the rehabilitation therapist's opinion as to the likelihood of full restoration of the use of a limb. See Forrestal v. Magendantz, 848 F.2d 303, 306 (1st Cir.1988).
 
 
 83
 Rule 703 provides that " [t]he facts or data ... upon which an expert bases his opinion ... may be those perceived by or made known to the expert at or before the hearing...." and need not be in evidence. In rendering an opinion, an expert may rely entirely upon hearsay data supplied by consultants, providing the data supplied is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...."
 
 
 84
 Manifestly, the former chief executive officer of one of the nation's largest coal mining companies, experienced in supervising the design and construction of approximately a dozen coal preparation plants, when asked to render an opinion concerning the elements of a diligent mining plan and the net profit it was likely to generate, was entitled to utilize, as part of the basis for his opinion, the judgment of others as to the cost of one of the elements of that plan--the preparation plant. There is not a hint of evidence in the record that a chief executive officer of a major mining company, even if he did not personally know the estimated cost of a coal preparation plant, would not typically and reasonably rely upon the opinion of others concerning the cost of constituent parts of the plan in forming an ultimate opinion as to a diligent mining plan and the profits it was likely to produce.
 
 
 85
 In extracting from Barker's diligent mining plan opinion a single constituent component of that opinion, the cost of the coal preparation plant, and invalidating that component of the witness' opinion, the majority misapprehends the purpose of expert testimony under Fed.R.Evid. 702 and the legitimate basis for it under Fed.R.Evid. 703.
 
 IV.
 
 86
 For the foregoing reasons, the court's implicit finding that the district court abused its discretion in allowing the witness Barker to express an expert opinion on the cost of the coal preparation plant is contrary to the facts in the record and the provisions of the Federal Rules of Evidence. I must therefore dissent from parts III-G and V of the court's opinion. I concur, however, in the balance of what is written.
 
 
 87
 I would therefore affirm the judgment in all respects.
 
 Order
 
 88
 April 22, 1992.
 
 
 89
 Before: KENNEDY, RYAN and BOGGS, Circuit Judges.
 
 
 90
 The parties in this case seek clarification of this Court's January 29, 1992 opinion as it relates to the award of post-judgment interest. The trial court's judgment, entered October 2, 1990, awarded Coal Resources $8,999,542 in damages. The trial court denied a motion by the plaintiffs for interest prior to the October 2, 1990 judgment. In its appeal of the District Court's decision, Coal Resources contended that the court erred in failing to award interest prior to October 2, 1990. We held:
 
 
 91
 The District Court denied a motion by the plaintiffs for an award of interest on the damage verdict. This Court can reverse this decision only if it finds an abuse of discretion. Coal Resources, [ Inc. v. Gulf & Western Indus. Inc., 865 F.2d 761, 776 (6th Cir.1989) ]. We find no such abuse.
 
 
 92
 We remanded the case for a new trial unless Coal Resources agreed to a remittitur of $226,563 of the damages awarded. Coal Resources consented to the remittitur on January 30, 1992. The parties disagree whether interest on the reduced damages should run from October 2, 1990 or January 30, 1992.
 
 
 93
 The determination of when interest begins to accrue on a money judgment is based on 28 U.S.C. § 1961 which states:
 
 
 94
 Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment....
 
 
 95
 The question in this case is whether the October 2, 1990 judgment, or the acceptance of the remittitur by the plaintiffs on January 30, 1992, thereby fixing the amount of actual damages, should be considered the date of judgment from which interest is calculated. This Court has held previously that the question of which judgment should be used to trigger interest is a matter of federal law. Bailey v. Chattem, Inc., 838 F.2d 149, 152 (6th Cir.), cert. denied, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988).
 
 
 96
 The Supreme Court addressed a similar situation in Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Bonjorno had brought suit against Kaiser alleging that Kaiser had monopolized the market for aluminum pipe. The jury found for Bonjorno and awarded damages on August 22, 1979. The District Court found the judgment unsupported by the evidence and ordered a new trial on the issue of damages. A judgment was entered on December 4, 1981, based on a jury award for Bonjorno of over $9 million in damages. The District Court granted a partial judgment notwithstanding the verdict. The Court of Appeals reinstated the December 4, 1981 judgment in 1986. The Supreme Court held that interest should be calculated from December 4, 1981 rather than August 22, 1979, the date of the legally insufficient judgment. The Court stated:
 
 
 97
 " [T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." Poleto v. Consolidated Rail Corp., 826 F.2d [1270, 1280 (3d Cir.1987) ]. Where the judgment on damages was not supported by the evidence, the damages have not been "ascertained" in any meaningful way. It would be counterintuitive, to say the least, to believe that Congress intended postjudgment interest to be calculated from such a judgment.
 
 
 98
 Bonjorno, 494 U.S. at 835 -36, 110 S.Ct. at 1576.
 
 
 99
 This Circuit has decided one related case since the Bonjorno decision. In Arthur S. Langenderfer, Inc. v. S.E. Johnson, Co., 917 F.2d 1413 (6th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991), a paving contractor brought an antitrust action against several road construction companies. Following a jury trial, the trial court entered judgment in accordance with the verdict and trebled the damages found by the jury. In a previous appeal, this Court vacated the first judgment and remanded the case finding that appropriate legal standards had not been applied. Arthur S. Langenderfer v. S.E. Johnson Co., 729 F.2d 1050 (6th Cir.), cert. denied, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984). The plaintiff then appealed the judgment from the second trial. We held that,
 
 
 100
 [u]pon a thorough consideration of the action of the district court with respect to disallowance of postjudgment interest claim by Langenderfer and NOAP on the original Langenderfer I award, we find no error in the district court's handling of this issue. The district court's decision not to allow interest on the judgment vacated in Langenderfer I is, we believe, clearly supported by the Supreme Court's recent decision in [Bonjorno.]
 
 
 101
 Langenderfer, 917 F.2d at 1447.
 
 
 102
 We believe that the case at issue can be distinguished from both Bonjorno and Langenderfer. The Supreme Court, in its decision in Bonjorno, stated that interest should accrue from the date of the second judgment because only at that point were damages "ascertained in any meaningful way." 494 U.S. at 836, 110 S.Ct. at 1576 (emphasis added). In both Langenderfer and Bonjorno the previous damage award was set aside and the District Court was directed to hold a new trial on the issue of damages. Here, the damages awarded to Coal Resources, were sufficiently ascertained at the time of the District Court judgment. The remittitur merely reduced the damages by a distinct amount easily determined from the facts of the case. Rule 37 of the Federal Rules of Appellate Procedure provides:
 
 
 103
 If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to the allowance of interest.
 
 
 104
 In light of this rule, we ORDER that interest on the damages awarded in this case be calculated from the date of the original District Court judgment, October 2, 1990.
 
 
 
 [1]
 The plaintiffs-appellees are identified collectively as Coal Resources, Inc. in the parties' briefs, in the rulings of the lower court, and in the prior decisions of this Court, and will be referred to by that designation in this opinion. Similarly, Virginia Met Coal Company, Jersey Kentucky Coal Company and New Jersey Zinc Company are wholly-owned subsidiaries of Gulf & Western Industries. In the parties' briefs, the rulings of the lower court, and the prior decisions of this Court they have been treated as an entity and referred to as Gulf & Western. We will do the same
 
 
 [2]
 The Study Team hired by G & W to prepare a Property Development Report which estimated the profit that G & W would have achieved from diligent mining, filed a report stating: "[a]lthough we would argue about certain areas, it seems we can accept Stonie Barker's position in all but five areas." Exhibit 995. These areas were market price, reserve base, days worked, preparation plant type and timing, and deep mine start-up
 
 
 [3]
 G & W's expert, Lloyd Evans, stated during trial, "Mr. Barker and we really concluded about 20 percent of the strip coal would be oxidized to the point where it could not be sold as metallurgical coal." Joint App. at 3534
 
 
 [4]
 Eddy estimated that metallurgical coal of slightly lower quality than defendants' sold for $36.00 and $38.00 per ton before commission during the multiple years
 
 
 [5]
 G & W's Team plan results in a return on equity of just over 19%
 
 
 [6]
 Eddy, who was on the board of directors of a mine during the multiple, testified that 220 to 230 days of work would have been a satisfactory year. White Bourland, who operated three different mines during the multiple years, produced documents which indicated that these mines would have operated 232, 190, 228 days if no strike had occurred
 
 
 [7]
 We do not believe that this case is similar to a case where a doctor presents evidence on a patient illness and uses the results of tests and analyses conducted by other doctors and technicians. In those cases, the doctor relies on proven test methods and results to obtain information necessary to the treatment and care of a patient. In this case, Barker is relying on others to estimate the costs of an innovative project solely for the purposes of introducing these costs as evidence in litigation
 
 
 [8]
 As stated above, the adjustment in price of $725,000 results in a new plant cost of $2,025,000. This cost is then substituted in Barker's reports in the proper positions. The additional interest expense for the first fifteen months created by this adjustment totals $181,250 if Barker's assumed rate of 20% is used. The additional depreciation for the first fifteen months, using Barker's assumed rate of five percent per year, is $45,313. These sums are added, for a total of $226,563, and deducted from mine income
 
 
 [1]
 Although Terry's figure is higher than both of Barker's estimates, Barker explained how it confirmed Barker's own estimates:
 [Q.] [C]ould you just tell the ladies and gentlemen how the information he gave you corroborated the cost of the new coal washing facility?
 A. Well, it is very similar to the cost that I used. I used an estimate of a million, two, and in 1976, and it is very close to what I have used.
 Q. Is the figure that he provided lower or higher than yours looking at it from the point of view of 1976?
 A. It is higher than the number I used, but it's his--his is in 1990 dollars.
 Q. And you took it down to 1976 dollars?
 A. Yes, I took it back to 1976 dollars.
 
 
 [2]
 It is understandable that the majority mistakenly concludes that "Barker supplied no records or documentation...." Exhibits 1114, 1115, and 1119, despite their importance to the issue now being considered, are not included in the 4900 plus page Joint Appendix. They are, however, in the trial record, and Exhibit 1113 is in the Joint Appendix