UNITED STATES of America,
Plaintiff–Appellee,

v.

James W. WADE, Defendant–Appellant.

No. 90–4248.

United States Court of Appeals,
Fifth Circuit.

May 3, 1991.

F.R. "Buck" Files, Jr., Wm. C. Wright, Tyler, Tex. (court-appointed), for defendant-appellant.

Paul E. Naman, Asst. U.S. Atty., Bob Wortham, U.S. Atty., Beaumont, Tex., for plaintiff-appellee.

Before HENLEY [*], KING and GARWOOD, Circuit Judges.

KING, Circuit Judge:

James W. Wade appeals from his conviction and sentence for nine drug related offenses.[1] The district court sentenced him to 240 months in prison and five years of supervised release. He appeals on three grounds: (1) that the district court erred in not granting a new trial due to the alleged bias of the trial judge; (2) that the prosecution made improper comments during closing arguments; and (3) that the district judge improperly granted an upward departure under the United States Sentencing Guidelines (Guidelines). For the reasons set out below, we affirm.

I.

In early 1986, while James W. Wade (Wade) was the Sheriff of Orange County, Texas, he became interested in becoming partners with two other men to manufacture and sell methamphetamine. Wade used his influence to release one of the men, Addie Guillory (Guillory), from the county jail, and the drug operation began. Guillory was arrested shortly after his release, and Wade used his influence again to try to release him. Although unsuccessful, Wade did arrange for Guillory's bond.

Wade and Donnie Flowers (Flowers), the other man involved, agreed to exclude Guillory from the drug operation. In August 1986, Flowers received a plastic bag of marihuana from Wade. The marihuana was to be used to recruit another man into the operation. Later, Wade retrieved 100 pounds of marihuana from the crime lab, and delivered the marihuana to Flowers to distribute. Wade received cash from some of the drug sales.

Still during the conspiracy, Wade recruited Donald Duhon (Duhon) as a deputy Orange County Sheriff. Wade instructed the physician responsible to omit the standard drug test on Duhon. Wade then instructed Flowers to deliver a total of one-quarter ounce of methamphetamine to Duhon. Wade and Flowers took meth oil and equipment from the evidence storage areas for cases awaiting trial in order to manufacture methamphetamine. The equipment originally belonged to Nyle Baker (Baker), a state parolee, before the authorities seized it. Wade had Baker's parole supervision moved to Orange County, and Wade and Flowers discussed further drug operations with Baker.

On May 12, 1987, Wade alerted Flowers of an impending undercover operation by the Orange County Sheriff's Narcotics Di-

---

[*] Circuit Judge of the Eighth Circuit, sitting by designation.

[1]. The jury found Wade guilty of nine of the ten counts he was charged with. He was found guilty of: conspiracy to manufacture, possess with intent to distribute and distribute a controlled substance in violation of 21 U.S.C. § 846; possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and conspiracy to obstruct justice in violation of 18 U.S.C. § 371.

vision. Wade then wrote a $200 check to Flowers's mother to indirectly provide money to Flowers for precursor chemicals for manufacturing methamphetamine.

In July, 1987, Wade and Flowers sold methamphetamine. In August or September, Baker gave Flowers an electric generator to manufacture methamphetamine. On September 1, Wade removed pills which he thought were methamphetamine from the sheriff's office.[2] He gave some of the pills to Flowers, as well as a rifle.

In October, Wade arranged for Flowers's release from the Hardin County jail. During the summer of 1983, Wade learned that he and Flowers might be implicated in the drug operation by a man who was interviewed by the authorities. Wade instructed Flowers to confront the man. Flowers did, and fired shots at the man to frighten him. Wade and Flowers, sensing that their conspiracy might unravel, discussed false statements they might make to the police if arrested.

In January, 1988, Flowers met with the F.B.I., and provided them with false statements. As others involved in the operation were questioned, Wade instructed them to provide false statements and to say nothing about Wade. Wade also learned that Flowers, still in the Hardin County jail, was cooperating with the authorities. Wade said he wanted to bail Flowers out of jail and kill him.

## II.

### A.

■ Wade's case was originally assigned to United States District Judge Howell

Cobb. Judge Cobb granted Wade's motion to transfer and moved the trial from Beaumont, Texas to Sherman, Texas due to the possibility of prejudicial pre-trial publicity in Beaumont, where Wade was Sheriff. After a lengthy jury trial, the jury convicted Wade, on September 21, 1988, of nine counts for drug related offenses. *See supra* note 1. Nearly one month later, on October 19, 1988, Wade moved to disqualify Judge Cobb under 28 U.S.C. § 455(a) and moved under Rule 33 of the Federal Rules of Criminal Procedure for a new trial.[3] Five days later, Wade moved to disqualify Judge Cobb under 28 U.S.C. § 144.[4] Although Judge Cobb initially denied the recusal motions, he recused himself on December 29, 1988, and United States District Judge William Wayne Justice became the judge of record. Judge Justice denied Wade's motion for a new trial, which Wade now appeals, and later sentenced Wade.

Wade argues that Judge Cobb was biased against him based on five things Judge Cobb said or did prior to judgment. First, Wade discusses a conversation his counsel, Gary Richardson (Richardson), had with Judge Cobb on September 19, 1988. According to Richardson's affidavit, Judge Cobb invited Richardson into his chambers after the defense and prosecution had rested and closed, but before the jury had received its charge. Once in chambers, Judge Cobb commented, "[w]ell, it looks like you may have walked him out of here," referring to Wade. After Richardson agreed, Judge Cobb added "[w]ell, to tell you the truth I hope you don't." Judge Cobb explained that he hoped the jury would find Wade guilty because "my court

---

**2.** It was later found that these pills were non-narcotic.

**3.** § 455(a) states:
   Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**4.** § 144 states:
   Whenever a party to a proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has personal bias or preju-

dice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

   The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

reporter is in financial straits and I would like to see him get the work," adding that he gets everything that he can set for hearing in order to create work for his court reporter.

Wade relayed, moreover, a conversation between John Hannah (Hannah), one of Wade's attorneys, and Judge Cobb. The conversation took place in Judge Cobb's chambers before a pretrial hearing. Judge Cobb asked Hannah to promise to pay the court reporter's bill as soon as Hannah returned to his office.

Second, Wade argues that Judge Cobb was critical of his counsel. Judge Cobb, in denying a motion for mistrial based upon prosecutorial misconduct, said that "the defense is trying to try Wayne Dial, the agents of the government, ... and every other witness except James Wade. It has engaged in such insinuations about everybody that has testified on behalf of the government." Wade contends that Judge Cobb's statement could be explained as significant bias against Wade.

Wade did not include this comment by Judge Cobb in his motion for a new trial—he argues it for the first time on appeal. Furthermore, the comment, in context, does not show judicial bias against Wade. The comment was made out of the hearing of the jury following a motion for a mistrial. Just prior to the comment, Judge Cobb had sustained an objection by Wade's counsel, and had given the jury a limiting instruction.

Third, Wade contends that Judge Cobb admitted hearsay evidence offered by the government on the ground that it was not hearsay because it was not offered for the truth of the matter asserted. Judge Cobb admitted the evidence with instructions limiting its use. Wade argues that he was unsuccessful in obtaining similar treatment when he attempted to offer other evidence which Judge Cobb ruled was hearsay in part because it was offered for the truth of the matter asserted. Wade claims that this alleged discrepancy reflects Judge Cobb's bias against Wade.

Wade fails to show, however, that Judge Cobb's rulings were, in fact, inconsistent. Wade does not explain why any exceptions to the Hearsay Rule should apply to the testimony of defense witnesses to statements by third parties that Judge Cobb excluded as hearsay. Moreover, even if we assume, *arguendo*, that these rulings were inconsistent, Wade cites only two instances where Judge Cobb ruled inconsistently on hearsay evidence. Given the fact that the trial lasted for five weeks, these two instances do not rise to the level of judicial bias.

Fourth, Wade claims bias because Judge Cobb interjected himself into the trial. In support of his contention, Wade offered the testimony of Hannah, who represented Wade up until trial. Hannah testified that Judge Cobb "was more hopelessly biased than any federal judge" he had ever seen. Hannah further testified that at one point in a pretrial hearing, Judge Cobb objected to the defense, without the prosecution objecting first. Wade states that, at trial, Judge Cobb questioned witnesses to highlight points made by the government; interrupted Wade's attorneys; and objected to the defense without the prosecution objecting.

Wade points to seven instances where Judge Cobb took an active role in the five-week trial. Given the fact that federal district judges have the power to take an active role at trial, this does not, in itself, demonstrate judicial bias. *See United States v. Iredia,* 866 F.2d 114, 119 (5th Cir.), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989).

Wade's fifth and final reason for arguing that Judge Cobb was biased against him was that he suggested to Wade's attorneys that a record would be made for the court of appeals. Wade claims that this demonstrates Judge Cobb's belief that the jury would convict Wade. Judge Cobb said, when certain evidence was objected to by the government as inadmissible, that "there will be a complete record made for review by the Court of Appeals if I make a ruling that dissatisfies you."

This comment does not suggest, as Wade argues, that Judge Cobb believed Wade would be convicted. The comment merely illustrates that a record of the ruling would be made for the court of appeals. Judge Cobb's comment does not imply that Wade would be convicted, or that Judge Cobb wanted him to be convicted.

Courts have repeatedly stated the importance of unbiased and unprejudiced judges:

> One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of actual bias or prejudice in the trial of the case.

*United States v. Brown*, 539 F.2d 467, 469 (5th Cir.1976) (quoting *Knapp v. Kinsey*, 232 F.2d 458, 465 (6th Cir.1956)); *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1954).

"A recusal motion under both statutes is committed to the sound discretion of the district judge. On appeal we ask only whether he has abused that discretion." *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). *See* 8 A. Moore's Federal Practice § 33.02[1] at 33–5 ("[o]n appeal, the denial of a Rule 33 motion will not be disturbed unless there has been an 'abuse of discretion' by the trial court").

Judge Justice denied Wade's motion for a new trial because the "record as a whole reflects that there were no significant improprieties in Judge Cobb's conduct of the trial." In fact, Judge Justice held that, "[t]o the contrary, Judge Cobb showed himself highly solicitous of the defendant's rights."

Judge Justice based his order, in part, on the fact that Judge Cobb

[kept] out of the hearing of the jury, and [excluded], certain highly prejudicial testimony relating to allegedly concupiscent conduct by the defendant—testimony which, while it was germane to the prosecution's case, would likely have laid a dark stain on the defendant's character in the eyes of the jury.

Judge Justice also discussed Judge Cobb's comments to Richardson regarding the court reporter. Judge Justice found the comments were "certainly ill advised," but were "made near the conclusion of a trial at which Judge Cobb had demonstrated fairness, impartiality, and due regard for the defendant's rights." In addition, Judge Justice did not agree with Wade that Judge Cobb's involvement in the trial favored the government. Judge Justice wrote that "[w]hile Judge Cobb participated actively in the trial ... his participation showed no particular favor to either side and was well within the limits prescribed for judicial engagement."

■ In reviewing Judge Justice's denial of Wade's motion for a new trial, we must decide whether Judge Justice abused his discretion. The standard for Judge Justice to determine whether Judge Cobb's conduct violated § 455(a) was whether "a reasonable person, knowing the relevant facts, would expect that a justice, judge or magistrate knew of circumstances creating an appearance of partiality, notwithstanding a finding that the judge was not actually conscious of those circumstances." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850, 108 S.Ct. 2194, 2197, 100 L.Ed.2d 855 (1988); *United States v. Couch*, 896 F.2d 78, 82 (1990).[5]

The relevant facts that Judge Justice took into consideration were not only Judge Cobb's active role in the trial and his inappropriate and ill advised comments to Rich-

---

**5.** In *Couch,* this court distinguished between the tests for impartiality under § 455(a) and under the due process clause. The test under the due process clause is whether a reasonable judge would find it necessary to step aside. *Couch,* 896 F.2d at 82. Wade brought his motion under § 455(a); the government construed the motion as a due process clause challenge. Because the § 455(a) standard has a lower threshold for the

movant to meet than the due process clause standard, we analyze the instant case under § 455(a). *See Couch*, 896 F.2d at 81, 82. We note that even if a movant were to meet the test for disqualification under § 455(a), this may not, by itself, be sufficient for the ordering of a new trial. *See Liljeberg,* 486 U.S. at 862, 108 S.Ct. at 2203.

ardson about his court reporter, but also Judge Cobb's transfer of the trial from Beaumont to Sherman, Texas, and the exclusion of evidence relating to Wade's concupiscent conduct. Both the change of venue and the exclusion of evidence of concupiscent conduct were decisions up to Judge Cobb's discretion, and he ruled, in both cases, in Wade's favor. These rulings, moreover, were at the time very important. The record reflects that, before trial, media coverage in Beaumont of Wade's case was extensive. In addition, the exclusion of evidence of concupiscent conduct deprived the government of introducing evidence of a possible motive for Wade's involvement in the drug operation.

In sum, Judge Justice did not abuse his discretion in holding that a reasonable person, knowing the relevant facts, would not expect that Judge Cobb knew of circumstances creating an appearance of partiality.

### B.

■ Wade next argues that the government made improper comments during closing argument, and that this court should grant Wade a new trial. Wade did not testify in his own defense, and the government, in its closing argument, stated:

> Where did [Wade] get six thousand dollars of cash? Four thousand into the account, and two one thousand dollar cash deposits to pay off loans. Yes. Where did he get this cash from? Defense didn't want to talk to you about that.

Wade argues that, because he was the only person who could testify as to how he got the money, the government was infringing on his fifth amendment right not to testify. At trial, Wade objected to the argument, but the objection was overruled.

In deciding whether a comment made by the government in its closing argument is a comment against the defendant's failure to testify,

> we must apply the test established by *Samuels v. United States*, 398 F.2d 964, 968 (5th Cir.1968), *cert. denied*, 393 U.S. 1021 [89 S.Ct. 630, 21 L.Ed.2d 566]

(1969).... We must determine ... if "it can be said that the prosecutor's manifest intention was to comment upon the accused's failure to testify [or] was ... of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."

*United States v. Smith*, 890 F.2d 711, 717 (5th Cir.1989). It is well settled that, while the "fifth amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify," a "prosecutor may comment ... on the failure of the defense, as opposed to the defendant, to counter or explain the evidence." *United States v. Borchardt*, 809 F.2d 1115, 1119 (5th Cir.1987). In the instant case, the prosecutor's comment does not appear to be of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. In fact, witnesses other than the defendant could testify to such information, such as the source or sources of the money. Wade summarily claims that he "is the only person in the world who could answer [the prosecutor's] question." He does not explain why this is the case, or why the jury would naturally and necessarily take it to be the case. Thus Wade fails one prong of the *Samuels* test.

Nor does Wade meet the other prong of the *Samuels* test. He does not show that the prosecutor's manifest intention was to comment upon Wade's failure to testify. Because Wade does not meet either prong of the *Samuels* test, his claim for a new trial based on the prosecutor's comments made during closing argument fails.

### C.

Wade's final argument is that the district court erred in its application of the Guidelines. He claims that the district court erred in not determining Wade's Guideline range and in departing upwards from the Guidelines.

■ Wade's first argument is that the district judge did not determine Wade's Guideline range. The presentence report

(PSI) calculated Wade's offense level at 34, with a criminal history category of I. The district court, at the sentencing hearing, accepted the PSI offense level of 34 by expressly overruling all of Wade's objections to the PSI, referring to the "calculated guideline range," and stating the maximum sentences as set out in the PSI. This acceptance of the offense level of 34 meets the requirement that "the trial court must determine the Guideline range so as to provide the reviewing court with a benchmark against which to assess the reasonableness of the sentence imposed." *United States v. Shaw*, 891 F.2d 528, 530 (5th Cir.1989).

Wade next argues that the district court erred by departing from the Guidelines in computing his sentence. The Guidelines authorize departure when the court finds "an aggravating or mitigating circumstance … that was not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). Our standard of review is that "a departure from the Sentencing Guidelines will be affirmed if it is based on 'acceptable reasons' and it is 'reasonable.'" *United States v. Velasquez–Mercado*, 872 F.2d 632, 635, 637 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 187, 107 L.Ed.2d 142 (1989) (quoting *United States v. Mejia–Orosco*, 867 F.2d 216, 219 (5th Cir.1989), *clarified on reh'g*, 868 F.2d 807, 807–08 (5th Cir.1989)).

■ Wade contends that the district judge's reasons for upward departure—obstruction of justice, background in law enforcement, and danger to the public health and safety—were incorrectly applied. Wade's first claim is that the district judge erred in departing upward for obstruction of justice. Wade argues that, because he was assessed a two-level upward adjustment for obstruction of justice, the district judge could not also use obstruction of

justice as a reason for departing upwards. In support of this argument, Wade points out that part of U.S.S.G. § 3C1.1, comment (n.4) was deleted as of November 1, 1989.[6]

Despite the amendment deleting part of application note four, district judges can and do still depart upwards for obstructions of justice. *See United States v. Simmons*, 924 F.2d 187 (11th Cir.1991) ("obstruction of justice … can provide a proper basis for [an upward] departure").

This court has said that a "sentencing court may depart upward from the guidelines and impose a sentence outside the guideline range if the court finds that an aggravating circumstance exists that was not adequately taken into consideration by the sentencing commission in formulating the guidelines. 18 U.S.C. § 3553(b)." *United States v. Rothman*, 914 F.2d 708 (5th Cir.1990). The district judge, at sentencing, stated that one reason for the upward departure was that Wade "received only a two-level increase for obstruction of justice and this increase is inadequate as he was convicted on two separate counts of conspiracy to obstruct justice." The PSI and the record on appeal reflect that Wade obstructed justice on numerous occasions. Wade, for example, discussed with coconspirators false statements to tell the authorities, including the FBI; alerted Flowers of an undercover operation by the Orange County Sheriff's Office Narcotics Division; and instructed Flowers to threaten a man who was speaking to authorities. Flowers fired shots at the man to frighten him. Therefore the two-level increase for obstruction of justice was inadequate given the egregious facts of this case.[7]

■ Wade next contends that the district judge improperly cited Wade's experience in law enforcement as a reason for depart-

**6.** The deleted section read, in part, that "in cases in which a significant further obstruction occurred during the investigation or prosecution of an obstruction offense itself (one of the above listed offenses), an upward departure may be warranted (*e.g.*, where a witness to an obstruction offense is threatened during the course of the prosecution for the obstruction offense)."

**7.** *See United States v. Diaz–Villane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989) (in order to determine whether circumstances warranting upward departure exist in a particular case, appellate court can look to the record).

ing upwards. At the sentencing hearing, the district judge said that "the calculated guideline range gives no consideration" to the fact that Wade was the chief law enforcement officer in the county.

Wade argues that the Guidelines stand for the proposition that sentences should be based upon crimes, not defendants. The court has, however, taken former law enforcement experience into consideration. In *United States v. Pridgen*, the court stated that the fact that "the appellant was a former law enforcement officer evidently conscious of the magnitude of his crime" was one of a number of factors "mentioned by the district court [which] ... support[s] the sentencing departure." 898 F.2d 1003, 1004 (5th Cir.1990). Wade argues that because *Pridgen* is factually distinguishable, it does not give "*carte blanche* approvals" to upward departures for law enforcement officers.

While we agree that *Pridgen* does not give approval for an upward departure each time a law enforcement officer is sentenced, it does stand for the proposition that, in certain cases, law enforcement experience is an acceptable reason to depart upwards. In the instant case, Wade abused his position as sheriff to further his drug manufacturing conspiracy. For example, Wade passed along information regarding future investigations to coconspirators; seized drug manufacturing equipment that was to be used as evidence in another drug case; convinced the Hardin County Sheriff to release Guillory, a coconspirator, from jail; had Guillory released by the Houston Police Department following an arrest; recruited Duhon, another coconspirator, to be a deputy sheriff; removed meth oil from the Sheriff's office; and had Baker's parole supervision transferred to Orange County. Given Wade's egregious behavior in abusing his position as sheriff, the district judge reasonably relied upon his position as sheriff as a factor in departing upwards.

Finally, Wade contends that the district judge improperly relied upon U.S.S.G. § 5K2.14 as the final reason for the upward departure. Section 5K2.14 states that "[i]f national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense." Wade contends that this section only applies to offenses against *national* public health and *national* safety. This interpretation is not supported by the title of the section, "Public Welfare," or by the language of the section. Furthermore, other circuit courts have interpreted § 5K2.14 to apply to non-national public health and safety offenses. U.S.S.G. § 5K2.14. *See United States v. Rodriguez–Castro*, 908 F.2d 438 (9th Cir. 1990) (high speed chase warranted departure under § 5K2.14); *United States v. Joan*, 883 F.2d 491 (6th Cir.1989) (departure under § 5K2.14 due to criminal history of defendant). We hold that the district judge could depart from the Guidelines because Wade endangered the public health and safety by abusing his public office to further the manufacturing of drugs. Wade, for example, recruited a coconspirator as a deputy sheriff; transferred Baker's parole supervision to Orange County; convinced the Hardin County Sheriff to release Guillory from jail; and gave Flowers a rifle for protection after falsely claiming that he paid $400 for it from the "Narcotics Buy Fund."

While we find that the factors the district judge relied upon for his upward departure were reasonable, we must also decide whether the length of the departure was itself reasonable.[8] The PSI, which the district judge accepted, calculated Wade's offense level as 34, with a range of 151–188 months imprisonment. The district judge departed upwards to a sentence of 240 months. Given the district judge's expertise in calculating the sentence, as well as

---

**8.** *See United States v. Diaz–Villane*, 874 F.2d 43, 49–50 (1st Cir.1989) (Whether the length of departure is reasonable is "quintessentially a judgment call. District courts are on the front lines, sentencing flesh-and-blood defendants.... Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior 'feel' for the case. We will not lightly disturb decisions to depart or not, or related decisions implicating degrees of departure.").

Wade's thoroughly egregious behavior as Sheriff of Orange County, we find that the upward departure to 240 months is reasonable. We note, moreover, that Wade does not argue that the length of the departure is unreasonable—only that the bases for the departure were inappropriate.

### III.

For the foregoing reasons, we affirm the judgment and sentence of the district court.

AFFIRMED.