In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-2035, 98-2036, 98-2037, 98-2038 & 98-2060

United States of America,

Plaintiff-Appellee,

v.

Jeff Boyd, Charles Green, Sammy Knox,
Noah R. Robinson, and Melvin Mays,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 89 CR 908--James B. Zagel, Judge.

Argued September 27, 1999--Decided April 3, 2000

Before Posner, Chief Judge, and Ripple and Rovner,
Circuit Judges.

Posner, Chief Judge.  The defendants, members of
Chicago's "El Rukn" street gang, were indicted
along with other members of the gang in 1989 on a
variety of serious federal charges. They were
tried before a jury in 1991 (all but appellant
Mays) and convicted; but the trial judge (Judge
Aspen) ordered a new trial because the government
had knowingly used false testimony to convict
them and had failed to disclose materials that
the defendants could have used to impeach the
government's witnesses. After we affirmed his
order, 55 F.3d 239 (7th Cir. 1995), the
defendants were retried, this time before Judge
Zagel, and at the end of the 12-week trial the
jury again convicted the defendants (now
including Mays) of multiple crimes--mainly
narcotics violations, and murders committed in
the course of turf wars with rival drug gangs--
all pursuant to a continuing and wide-ranging
conspiracy reaching back to the mid-1960s. All
five defendants were sentenced to life
imprisonment except Boyd, who was sentenced to 50
years.
   The appeals present almost 20 separate issues,
but we confine our discussion to those that have
at least colorable merit. Although all the
appellants are represented by counsel, Robinson
has filed a pro se supplemental brief. Earlier
motions by him to file such a brief were

repeatedly denied. Eventually the presiding judge of this panel allowed it to be filed; but on further consideration, given the lateness of the filing (long after the case was argued), we have decided to vacate the order allowing the brief to be filed. It goes without saying that a represented litigant has no right to file a pro se brief, e.g., United States v. Gwiazdzinski, 141 F.3d 784, 787 (7th Cir. 1998), and although we can permit such a filing in appropriate circumstances, e.g., Hayes v. Hawes, 921 F.2d 100, 101-02 (7th Cir. 1990) (per curiam), given the lateness of the filing and the repetitive character of the motion the circumstances are not appropriate.

At the first trial--the one set aside because of prosecutorial misconduct--Edgar Cooksey was a defendant and he was convicted with the others. But after the new trial was ordered, he pleaded guilty, and he testified for the government at the second trial. The examination of Cooksey both by the government's lawyer and by one of the defense lawyers, which was conducted over a period of three days, brought out the fact that Cooksey had been a codefendant of at least some of the current defendants, that they had been indicted in 1989, that he had testified at a previous jury trial in 1991 called "United States v. Boyd" (which the current jury knew, of course, was the title of the case it was hearing), that he had spoken to the judge in that trial in "allocution" and had "accepted responsibility" for his acts, that he had pleaded guilty shortly before the beginning of the current trial, and that he had been in prison continuously since 1991. The lawyers for the other defendants thrice objected to the questions that elicited this information, and moved for a mistrial on the ground that the jury was bound to infer that the defendants had been convicted by a previous jury. The government concedes that it can be a reversible error to disclose to the jury (or allow the jury to discover) that a defendant was previously convicted by another jury, see, e.g., United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir. 1983); United States v. Attell, 655 F.2d 703, 705-06 (5th Cir. 1981); United States v. Williams, 568 F.2d 464, 470-71 (5th Cir. 1978), though reversal is not automatic. Patton v. Yount, 467 U.S. 1025, 1031-35 (1984); United States v. Keating, 147 F.3d 895, 900 (9th Cir. 1998); cf. United States v. Bruscino, 687 F.2d 938, 940 (7th Cir. 1982) (en banc); United States v. Plescia, 48 F.3d 1452, 1464-65 (7th Cir. 1995). And reversal is out of the question--no possible prejudice is shown--if the damning fact is not actually disclosed. Judge Zagel refused to grant a mistrial, saying he thought it unlikely that the jury would infer that the defendants had

previously been found guilty; if he was right, the question whether the jury could have set aside their knowledge of the fact would not even arise.

The question of what the jury is likely to have inferred from statements made in its presence, like the question whether the jury is likely to have been prejudiced by hearing things they shouldn't have, Marshall v. United States, 360 U.S. 310, 312 (1959) (per curiam); United States v. Bruscino, supra, 687 F.2d at 940-41; United States v. Zizzo, 120 F.3d 1338, 1349 (7th Cir. 1997), is quintessentially one for the trial judge to answer, subject only to light appellate review. Because he has his finger on the pulse of the trial and monitors the alertness and attentiveness of the jury, he is in a better position than the appellate judges to determine whether prejudicial matter presented at the trial is likely to have affected the outcome. Judge Zagel could tell how the jurors seemed to be "taking" the revelations concerning Cooksey's previous trial. In the circumstances, we do not think he abused his discretion in refusing to grant a mistrial. The revelations had been scattered over three days of examination and cross-examination of Cooksey and, since they employed technical legal terminology (such as "allocution") and were thus susceptible of other interpretations by a jury of lay persons, did not compel an inference that the current defendants had previously been convicted.

The next issue concerns the admissibility of tape recordings of telephone conversations in 1985 and 1986 in which the defendants made incriminating admissions. The defendants argue that the reliability of the recordings was never adequately determined, that some may have been tampered with, and that the government violated the Brady rule by failing to disclose a specific problem with the accuracy of the tapes that could have been used to impeach the government's evidence. Brady v. Maryland, 373 U.S. 83 (1963). Because tape recordings at once are devastatingly effective evidence and are susceptible to tampering that is very difficult to discover, Title III--the federal statute that regulates electronic surveillance--requires that recordings "be done in such way as will protect the recording from editing or other alterations." 18 U.S.C. sec. 2518(8)(a). To this end, the section requires that the recordings be judicially sealed as soon as the interception order pursuant to which they were made expires. Id.; United States v. Ojeda Rios, 495 U.S. 257, 263 (1990); United States v. Jackson, No. 98-2696, 2000 WL 248575, at *3 (7th Cir. March 23, 2000); United States v. Plescia, supra, 48 F.3d at 1463; United States v.

Wong, 40 F.3d 1347, 1375 (2d Cir. 1994). This was done here, back in 1985 and 1986. The original recordings were placed in sealed envelopes, and the envelopes in sealed boxes. Some of the seals, both on boxes and on envelopes, were later broken, and anyway the recordings that were actually placed in evidence were not the original recordings. They were copies of duplicate originals made at the same time as the original recordings and intended to be identical to them. They differed--or at least were supposed to differ--only in having been made on a different machine, recording the same conversations. Neither the duplicate originals nor the copies made from them were secured against tampering.

The admissibility of the copies was not challenged at the first trial, and the district judge ruled that this waived the issue as to all the appellants but Mays, who was not a defendant at that trial. The judge was wrong. Rulings made at a previous trial of the same case only presumptively control the second trial, under the doctrine of law of the case, Alston v. King, 157 F.3d 1113, 1116 (7th Cir. 1998), and when the ruling concerns the admissibility of evidence the presumption is either nonexistent, Tang v. Rhode Island, 163 F.3d 7, 11 (1st Cir. 1998); United States v. Akers, 702 F.2d 1145, 1147-48 (D.C. Cir. 1983), or weak, Menzer v. United States, 200 F.3d 1000, 1004-05 (7th Cir. 2000); United States v. Williams, 2000 WL 204531, at *11 (2d Cir. Feb. 23, 2000); United States v. Todd, 920 F.2d 399, 403 (6th Cir. 1990); United States v. Birney, 686 F.2d 102, 107 (2d Cir. 1982), since issues of admissibility are often highly contextual and evidence at a second trial will often deviate significantly from that at the first. See, e.g., Coal Resources, Inc. v. Gulf & Western Industries, Inc., 954 F.2d 1263, 1265-66 (6th Cir. 1992). (The presumption is strongest when the ruling concerns a rule of law, and some cases might be taken to suggest that it operates only then. Arizona v. California, 460 U.S. 605, 618 (1983); Payne v. Churchich, 161 F.3d 1030, 1037 n. 8 (7th Cir. 1998).) Even the Ninth Circuit, which takes a harder line on the binding effect of evidentiary rulings made in the first trial, United States v. Tham, 960 F.2d 1391, 1397-98 (9th Cir. 1991), does not regard failure to object at the first trial as an irrevocable waiver. Id. at 1398; United States v. Seidman, 503 F.2d 1027 (9th Cir. 1974). The judge's error in supposing the defendants absolutely precluded from challenging the admissibility of the copies at the second trial was peculiarly harmless, however, since he had to discuss the merits of the issue of admissibility with regard to Mays, and that discussion is equally applicable to the admissibility of the tape recordings against the

other defendants. And so let us turn to those merits.

The fact that the recordings used at the trial had not been sealed was not, as the defendants argue, fatal; nor the fact that the seals had been broken (the seals have to be broken at some point, if the recordings are to be placed in evidence). Neither Title III nor the case law places specific restrictions on the manner in which the contents of tape-recorded conversations can be communicated to the jury at trial. See 18 U.S.C. sec. 2517(3); United States v. Rivera, 153 F.3d 809, 812 (7th Cir. 1998). The relevant issues are, rather, whether Title III permitted the disclosure of the contents of the conversations at all, and whether (if so) the particular evidence conveying those contents to the jury was adequately authenticated.

The contents of a recorded communication governed by Title III can lawfully be disclosed even if the recording was not under seal, provided the absence of the seal is satisfactorily explained. 18 U.S.C. sec. 2518(8)(a); cf. United States v. Jackson, supra, at *3. The usual satisfactory explanation is a judicial order unsealing the recording so that it can be used in evidence, and such orders were indeed issued here for both sets of tapes that are at issue. In the case of successive trials, as we have here, the recording should be resealed after the first trial, United States v. Long, 917 F.2d 691, 699-700 (2d Cir. 1990); United States v. Scopo, 861 F.2d 339, 347 (2d Cir. 1988)--and promptly, too. But this was done. Although defendants argue--belatedly, in their reply brief, Employers Ins. of Wausau v. Browner, 52 F.3d 656, 665-66 (7th Cir. 1995)--that one set of tapes had been unsealed for the nine years since the first trial, the trial judge was entitled to and did credit the contrary testimony of the government agent who examined them in preparation for the second trial.

But it is not the case that these recordings were merely removed from the boxes and envelopes pursuant to judicial order and played to the jury; they were not played to the jury at all; copies were played to the jury and the second and separate issue concerning their admissibility is whether the copies were adequately authenticated. On this issue two types of evidence were presented that the judge found convincing. First, one of the turncoat witnesses, Jackie Clay, testified that a recording of a telephone conversation that he had participated in back in 1986 was accurate. Although testifying ten years later Clay could hardly have been certain about the matter--any pretense of certainty would

merely have cast doubt on his credibility--participants in other recorded conversations who testified for the government were not asked by the defendants' lawyers whether the recordings were accurate. The district judge inferred from testimony by government agents that the other conversations had been recorded in like manner to the one Clay testified about and, from the absence of any contrary evidence, that the recordings of those conversations were probably accurate too. Second, a government agent testified that he opened some of the sealed evidence envelopes pursuant to an unsealing order by the district judge and compared the tapes in them to the tapes played at trial, and found no discrepancies.

Clay's testimony was weak because of the lapse of time. The agent's was stronger, although not airtight. For one thing, he didn't compare all the tapes played at trial with the originals. Rather, he conducted a spot check, and having discovered no discrepancies in the tapes that he sampled decided not to check further. For another, there is an unexplained discrepancy between one of the original recordings and its duplicate original, which although supposed to be identical contained conversations not audible on the original. The expert who examined the two tapes could not determine the cause of the discrepancy. It could have been a malfunction, or it could have been a bit of creative editing, but the latter inference, as the judge determined, was the less likely, precisely because the duplicate contained more conversation than the original. It was the duplicate that was used in evidence, and if the government had edited out portions that favored the defendants, the original would have had more conversation than the duplicate. Although it is possible in principle that the government "edited in" additional conversation to the duplicate, there is no indication at all of this more elaborate form of tampering. Similarly, while it would have been preferable had the agent checked all the tapes, no reasons have been suggested for doubting either the good faith or the adequacy of his sampling.

It is essential to distinguish between excluding evidence for want of adequate authentication, and challenging its weight. The defendants were entitled to and did question the weight that the jury should give the tape recordings in light of the possibility of tampering, but questions of authentication are governed by Fed. R. Evid. 901(a), which merely requires "evidence sufficient to support a finding that the matter in question is what its proponent claims," that is, that the recordings played to the jury were

in fact recordings of the defendants' conversations. Testimony by an "ear" witness, such as Clay, is sufficient, United States v. Brown, 136 F.3d 1176, 1182 (7th Cir. 1998); there is more here; and we have said in previous cases that only in "extraordinary" circumstances will we reverse the trial judge's decision to admit tape recordings over objections based on lack of authentication. United States v. Magana, 118 F.3d 1173, 1207 (7th Cir. 1997); United States v. Welch, 945 F.2d 1378, 1383 (7th Cir. 1991); United States v. Vega, 860 F.2d 779, 788 (7th Cir. 1988). That high standard is not met here.

The Brady rule requires the government to disclose evidence it knows about that would be helpful to the defense, whether because the evidence is exculpatory or because it could be used to impeach the government's evidence. Brady v. Maryland, supra, 373 U.S. at 87; Strickler v. Greene, 119 S. Ct. 1936, 1948 (1999). The discrepancy between one of the original tapes and its duplicate, a discrepancy that could have been used to some effect to impeach the government's taped evidence, may have arisen as early as 1986, when the two recordings were made; in any event it was not recent, and the defendants ask us to infer from this that the government must have known about it. But of this there is no other evidence and the inference is implausible because the government prepared its case from the duplicate originals while the "original originals" remained in storage. So far as appears, the discrepancy was first discovered by the defendants, who thought they heard something odd on one of the tapes; they drew this to the judge's attention and then the comparison was conducted, which confirmed the existence of the anomaly. Brady liability is not strict; the government does not violate Brady by failing to disclose information that it (or its agents, e.g., Kyles v. Whitley, 514 U.S. 419, 437 (1995)--a category that doesn't include the criminal defendants whom it prosecutes!) doesn't know about. United States v. Bhutani, 175 F.3d 572, 577 (7th Cir. 1999); United States v. Earnest, 129 F.3d 906, 910 (7th Cir. 1997); United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). The discrepancy between the tapes is such information.

We come last to the most troubling issue in the case--whether Judge Zagel should have disqualified himself from presiding at this trial. We have already held, in another case involving the El Rukns, that Judge Zagel's refusal to disqualify himself was not a plain error, United States v. Franklin, 197 F.3d 266, 270 (7th Cir. 1999), but the question remains whether it was error. There is a threshold

procedural question, which is both novel and unnecessary to resolve. Section 144 of the Judicial Code entitles a party to disqualify a judge (only once per case, however) on the basis just of an affidavit sufficiently alleging the existence of a personal bias or prejudice in favor of an adverse party or against the affiant; but the affidavit must be "accompanied by a certificate of counsel of record stating that it is made in good faith." Defendant Robinson filed a section 144 affidavit against Judge Zagel, but without the required certificate, because Robinson was proceeding pro se. The judge ruled that the absence of the certificate was fatal. The ruling denies pro se parties the benefit of the statute, a result that might be thought an undue burden on the constitutional right of a criminal defendant to proceed pro se. Faretta v. California, 422 U.S. 806, 834, 836 (1975); United States v. Brock, 159 F.3d 1077, 1079 (7th Cir. 1998); see also 28 U.S.C. sec. 1654. Yet the requirement of the certificate is salutary, given that the statute makes the party's affidavit conclusive for recusal provided it alleges the requisite bias or prejudice. The obvious solution, suggested by Robinson himself but opposed by the government and rejected by the judge, is to appoint a lawyer for the pro se defendant for the limited purpose of enabling him to determine whether to file the certificate. The rejection of this measure--a measure we commend to the district courts in future cases--turns out to have been harmless, however, because the relevant facts in Robinson's affidavit were conceded.

Section 455(a) of the Judicial Code requires a judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." Our cases hold that appellate review of a judge's refusal to disqualify himself under this section is possible only by petitioning the appellate court for mandamus before trial. E.g., In re Hatcher, 150 F.3d 631, 637 (7th Cir. 1998); United States v. Horton, 98 F.3d 313, 316-17 (7th Cir. 1996); Taylor v. O'Grady, 888 F.2d 1189, 1201 (7th Cir. 1989); United States v. Balistrieri, 779 F.2d 1191, 1204-05 (7th Cir. 1985). This is a minority position, see, e.g., In re Cargill, Inc., 66 F.3d 1256, 1264 and n. 10 (1st Cir. 1995); United States v. Cooley, 1 F.3d 985, 996 n. 9 (10th Cir. 1993); In re School Asbestos Litigation, 977 F.2d 764, 777 n. 12 (3d Cir. 1992); Chitimacha Tribe v. Harry L. Laws Co., 690 F.2d 1157, 1164 n. 3 (5th Cir. 1982), but the defendants do not ask us to reexamine it. On the contrary, they expressly waive any challenge to the rule by stating in their consolidated brief that "the motion for recusal under 28 U.S.C. sec. 455(a) could only be, and

was, appealed by mandamus." Given this express waiver by experienced counsel, it would be inappropriate for us to reexamine the rule in this case.

Because the rule forecloses appellate review at the conclusion of the case, we review a petition for mandamus to enforce section 455(a) under the normal appellate standard. Hook v. McDade, 89 F.3d 350, 353-54 and n. 3 (7th Cir. 1996). Such a petition was filed here, and another panel of this court denied it, but in an unpublished order with no statement of reasons, a disposition that we find puzzling because, as will soon become clear, the case for disqualification under section 455(a) was more than colorable, and indeed in our judgment was compelling. But there is no reason to suppose that the panel which denied mandamus applied the incorrect standard, and in the absence of such an error we cannot revisit the issue without abandoning the rule that makes mandamus the exclusive route for challenging a judge's refusal to disqualify himself under section 455(a).

The defendants also argue, however, that Judge Zagel should have disqualified himself under either of two other subsections (or both) of section 455. The first is (b)(1), which so far as bears on this case requires disqualification if the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." The second is (b)(3), which requires disqualification if the judge had, when he was a government employee, "participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

In 1983, at which time the now-Judge Zagel was the head of the Illinois state police, Robinson opened a restaurant in Chicago. Late in 1985 or early in 1986, when Zagel was still head of the state police, Robinson hired security guards for his restaurant from a company called Security & Maintenance Service (SMS), which was owned and operated by El Rukn "General" Hunter, a key government witness at the 1996 trial here on appeal. These guards were unarmed but SMS had applied for a license that would permit them to be armed. The El Rukns' purpose in operating a security agency whose employees were authorized to carry weapons was, of course, to strengthen the gang's position in the endless turf wars in the course of which the murders with which these defendants were charged were committed. The authorities got wind of the scheme. They were already investigating the El Rukns (whose drug and related criminal activities went back to the 1960s, remember) by means of a joint federal,

state, and local task force that included members of the Illinois state police. The task force conducted a "sting" of SMS. An Illinois state police officer played a key role in the sting, operating undercover and dealing directly with Hunter and Robinson. In June of 1986, Chicago police officers who were members of the task force and who later worked on the present case raided SMS's premises, which Robinson owned, and arrested (at another location) 18 of its employees. One of them, Crowder, was a defendant in the first trial of this case and a defense witness in the second trial, the trial before Judge Zagel.

The day of the arrest, Director Zagel held a joint press conference with Richard Daley, at the time the Cook County prosecutor. They announced the arrests and explained that they had begun investigating SMS when they learned that Crowder, an El Rukn "captain," had applied for a state firearm identification card. Zagel remarked that "street gangs [such as the El Rukns] have grown to rival organized crime in the scope of their operations, and in the savagery in which they control entire sections of the city." The El Rukns task force produced the evidence that led to the 1989 indictments of the present defendants. Not only did two of the El Rukns who had been involved in the SMS caper testify at the trial before Judge Zagel, but they testified--Hunter extensively--about the caper, using it to tie Robinson to other El Rukn activities as well.

In denying the motion to recuse, Judge Zagel said that the SMS investigation had had nothing to do with the current trial, but this is incorrect. The creation of SMS was part of the drug and incidental murder conspiracy for which the defendants in the present case were tried and convicted before Judge Zagel, although SMS's activities were not charged as overt acts of the conspiracy. The judge was involved in the investigation of activities at issue in the trial, and the press conference shows that he had personal, extrajudicial knowledge of those activities. But SMS's activities were not at issue in this case except insofar as they connected Robinson to the El Rukns. Had Judge Zagel learned of this connection from the 1986 investigation of SMS, Robinson would be entitled to a new trial before a different judge. But Zagel did not mention Robinson at the press conference, and there is no basis in the record for Robinson's claim that Zagel was the "point man" for the investigation and had "full knowledge" of its details. The judge denied this charge on the record, and in the absence of contrary evidence (Robinson's mere assertion not being evidence), we must credit the denial.

United States v. Balistrieri, supra, 779 F.2d at 1202.

   This conclusion is only superficially in tension with our (and Judge Zagel's) crediting the facts alleged in Robinson's affidavit in support of his motion to recuse Judge Zagel under 28 U.S.C. sec. 144. The only facts in such an affidavit that must be credited, and plainly the only facts in Robinson's affidavit that Judge Zagel did credit, are those that are "sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient." United States v. Sykes, 7 F.3d 1331, 1339 (7th Cir. 1993); see also United States v. Balistrieri, supra, 779 F.2d at 1199; Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1356 (3d Cir. 1990); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure sec. 3551, pp. 634-37 (2d ed. 1984). Robinson's assertions that Zagel was the "point man" of the investigation and had "full knowledge" of the details of the investigation don't count as factual assertions; they are conclusions.

   Section 455(b)(3) is also inapplicable. Zagel did not participate other than as judge in the present case and did not, back when he was head of the state police, express an opinion about it. The case was then, of course, years in the future. There is a pregnant difference in wording between the participation and expression-of-opinion clauses of 455(b)(3). The former refers to participation in "the proceeding," the latter to expressing an opinion on the merits of "the particular case in controversy," and we have held that the use of the word "particular" narrows the clause to the situation in which the judge expressed his opinion in "the present case, not a related former case." Russell v. Lane, 890 F.2d 947, 948 (7th Cir. 1989); cf. Rice v. McKenzie, 581 F.2d 1114, 1116 (4th Cir. 1978). In any event, since nothing Zagel said at the press conference could reasonably be construed as an expression of opinion on the merits of the case that he presided over, we need not pursue this novel and interesting interpretive question.
   The cases interpreting the participation clause do not require a formal identity between the proceeding in which the government employee who is now a judge participated or expressed an opinion about; it is enough if they overlap significantly. See, e.g., United States v. Outler, 659 F.2d 1306, 1312-13 (5th Cir. 1981); Jenkins v. Bordenkircher, 611 F.2d 162, 166 (6th Cir. 1979); Mixon v. United States, 608 F.2d 588, 591-92 (5th Cir. 1979). And there was an overlap here, in the part of the SMS investigation that linked Robinson to the El Rukns. But Director

Zagel never expressed an opinion about that aspect of the investigation, and the requisite "participation" is not imputed to a supervisor by virtue of his supervisory authority; it must be personal, and it was not. E.g., Mangum v. Hargett, 67 F.3d 80, 83 (5th Cir. 1995); Kendrick v. Carlson, 995 F.2d 1440, 1444 (8th Cir. 1993); United States v. Di Pasquale, 864 F.2d 271, 279 (3d Cir. 1988). The exception noted in the last-two cited cases for where the supervisor is the U.S. Attorney is not applicable here.

Recurring briefly to section 455(a), we wish to emphasize our belief that compliance with it is essential to the perceived legitimacy of the judicial process, especially when the defendants are vicious criminals facing long sentences and the prosecution has been marred by irregularities. It would have been far, far better for Judge Zagel to have recused himself in light of his earlier involvement with the parallel proceeding against the El Rukns and the fact that two of the El Rukns involved in that proceeding testified in the present case. But the panel that considered the petition for mandamus ruled that there was no violation of section 455(a), and while we disagree with the ruling, the issue of its soundness is not before us.

Several sentencing issues remain to be discussed. Green and Mays argue that their sentences violate the ex post facto clause, U.S. Const., art. I, sec. 9, cl. 3, because the conspiracies did not persist beyond the date on which the statutes under which they were sentenced were enacted or because they had withdrawn from the conspiracies prior to that date. The first claim is just wrong, for although there wasn't a great deal of evidence of continued drug dealing by the El Rukns subsequent to the crucial dates (November 1, 1987, for one of the statutes under which these defendants were sentenced and November 18, 1988, for another), there was enough to place the district judge's finding beyond possibility of reversal for clear error. Withdrawal from a conspiracy requires a definitive break, rather than mere cessation of activities even when combined with a subjective determination not to resume; otherwise a conspirator could sit back and wait to see whether the conspiracy had succeeded or failed and only then decide whether to announce that he had withdrawn. E.g., United States v. Wilson, 134 F.3d 855, 863 (7th Cir. 1998); United States v. Williams, 81 F.3d 1434, 1442 (7th Cir. 1996); United States v. Diaz, 176 F.3d 52, 98 (2d Cir. 1999). Mays's argument that he withdrew when he became a fugitive from justice borders on the frivolous, United States v. Pandiello, 184 F.3d 682, 687 (7th Cir. 1999), as it would merely reward fugitives; and anyway there is nothing

about hiding to suggest withdrawal--Mays was hiding from the police rather than from the El Rukns.

Green has a better argument, that he could not be given a sentencing enhancement for having been a leader of the conspiracy (U.S.S.G. sec. 3B1.1(a)) when his leadership role had--and this the government acknowledges--ended with his demotion from El Rukn "General" to private before the guideline under which his sentence was enhanced went into effect (as one of the original guidelines) on November 1, 1987. The conspiracy of which he was a member straddled the date of promulgation, and a crime that straddles can be punished under a guideline promulgated after the straddle date. E.g., United States v. Kramer, 955 F.2d 479, 485 (7th Cir. 1992); United States v. Hargus, 128 F.3d 1358, 1365 (10th Cir. 1997), and United States v. Smith, 46 F.3d 1223, 1239 (1st Cir. 1995). The straddle rule implies punishment for conduct committed before the date of the guideline that determined the severity of the punishment, and we cannot see what difference it can make whether the pre-guideline conduct was the sale of a quantity of drugs perhaps much greater than any that occurred after the critical date or the exercise of leadership responsibilities relinquished by that date.

Green's best case is United States v. Torres, 901 F.2d 205, 226-27 (2d Cir. 1990), which held that the ex post facto clause forbids punishing the defendants as "principal administrators, organizers, or leaders" of a continuing criminal enterprise if their leadership role did not continue after the enactment of the statute creating the offense, even though the enterprise itself did continue past that date. See also United States v. Williams-Davis, 90 F.3d 490, 510-11 (D.C. Cir. 1996) (acknowledging but distinguishing Torres). The statute at issue in Torres created a new substantive offense that required as one of its elements that the defendant have had a leadership role, and so punished Torres for engaging in conduct before the statute was passed. In our case the defendant committed all the elements of the offense after the change in the sentencing guideline and by doing so became responsible for the conduct in which he had engaged before the change. Torres was not a straddle case; ours is; if the difference seems tenuous, then we must reject Torres, as we are committed to the straddle doctrine--and so, for that matter, is the Second Circuit, which reaffirmed the straddle doctrine in Torres itself. We add that Green could have avoided the new guideline by quitting the conspiracy when the guideline was announced but before it took effect.

Last, we note some clerical mistakes in the judgments. Mays's judgment should reflect a guidelines life sentence on count 3 and 60 months on count 4, rather than vice versa, and Green's judgment should reflect a life sentence on counts 1 and 3 and concurrent 10-year terms on counts 4 and 5, rather than a life sentence on counts 1, 4, and 5 and a 10-year sentence on count 3. As modified to correct these mistakes, the judgments are

Affirmed.

RIPPLE, Circuit Judge, dissenting. The panel is unanimous in its view that the trial judge should have recused himself under sec. 455(a), which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Under the circumstances set forth in detail by the majority here, in any other circuit a new trial would be ordered. In this circuit, however, we can only review the trial judge's decision against recusal when the issue is presented in a petition for a writ of mandamus. The defendants did file a petition for mandamus relief from the trial judge's decision not to recuse himself, and another panel of this court denied that petition without opinion.

The rule that mandamus is the only avenue by which a party can seek review of a ruling under sec. 455(a) is well-established in this circuit. See United States v. Horton, 98 F.3d 313, 316-17 (7th Cir. 1996); Hook v. McDade, 89 F.3d 350, 353 n.2 (7th Cir. 1996); United States v. Towns, 913 F.2d 434, 443 (7th Cir. 1990). This circuit's view has been that sec. 455(a) is intended to protect against the appearance of impropriety, and that, once the proceedings in the district court have been completed, the harm sec. 455(a) seeks to prevent has already occurred. See United States v. Troxell, 887 F.2d 830, 833 (7th Cir. 1989). Thus, we have required litigants to bring mandamus petitions to cure potential problems under sec. 455(a) and to prevent a potentially tainted trial from ever taking place. See id.

No other court of appeals has followed our approach. See Kenneth M. Fall, Note, Liljeberg v. Health Services Acquisition Corp.: The Supreme Court Encourages Disqualification of Federal Judges Under Section 455(a), 1989 Wis. L. Rev. 1033, 1056. Some circuits have rejected explicitly our position. The Third Circuit has

said that mandamus is the preferred method of appeal, but allows review on direct appeal because it may provide a "partial cure" to any harm to the public perception of the judiciary. See In re School Asbestos Litig., 977 F.2d 764, 777 n.12 (3d Cir. 1992). The Tenth Circuit has held that, although sec. 455(a) is concerned with the rights of the public, the parties do retain some rights thereunder, and direct appeal may therefore be appropriate. See United States v. Cooley, 1 F.3d 985, 996 n.9 (10th Cir. 1993). Other circuits have entertained sec. 455(a) arguments on direct appeal and, indeed, have addressed the merits or found the issue waived because it was not raised in the district court. See, e.g., United States v. Mosby, 177 F.3d 1067, 1068-69 (8th Cir. 1999); United States v. Morrison, 153 F.3d 34, 48-49 (2d Cir. 1998); United States v. Barrett, 111 F.3d 947, 951-53 (D.C. Cir. 1997); United States v. Sturman, 951 F.2d 1466, 1481-82 (6th Cir. 1991); Diversified Numismatics, Inc. v. City of Orlando, 949 F.2d 382, 384-85 (11th Cir. 1991) (per curiam); United States v. Arache, 946 F.2d 129, 140 (1st Cir. 1991); United States v. Payne, 944 F.2d 1458, 1476-77 (9th Cir. 1991); United States v. Wade, 931 F.2d 300, 302-05 (5th Cir. 1991); United States v. Mitchell, 886 F.2d 667, 671 (4th Cir. 1989).

Moreover, we not only stand alone among the circuits in our approach to this question, but we also have taken a position in considerable tension with the decisions of the Supreme Court of the United States. Indeed, the Supreme Court appears to have taken a different path. Although the Court has not rejected explicitly that mandamus is the only avenue of review for sec. 455(a) matters, it has twice interpreted that section in cases brought to it in the manner of an appeal from final judgment. See Liteky v. United States, 510 U.S. 540 (1994); Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988). These cases, especially Liljeberg's approval of vacatur of a trial court's judgment, clearly cast significant doubt on our view that mandamus is the only appropriate remedy under sec. 455(a). Nevertheless, we never have considered whether these decisions of the Supreme Court make our approach untenable; we have continued to follow our same approach even after the announcement of those Supreme Court decisions.

This case points out one of the pitfalls of our approach. As the Third Circuit has suggested, a trial judge well might appear unbiased at the outset of a trial, but later events might cause a judge's impartiality to be reasonably questioned and thus make appropriate the "partial cure" of

reversing the improperly obtained verdict. Asbestos Litig., 977 F.2d at 777-78. Indeed, in one recent case, the First Circuit, although denying mandamus relief, specifically left open the possibility that further development of the record could lead to a different conclusion on an appeal from final judgment. See In re Martinez-Catala, 129 F.3d 213, 221 (1st Cir. 1997). Regardless of whether this panel would have issued the same ruling as the earlier motions panel if it had been presented with the record available at that early stage of the litigation, the record made at trial has convinced us that recusal is necessary. There must be public confidence in a judgment that incarcerates defendants, in some cases for the rest of their lives. The trial of this matter was a difficult task. It required that the trial court make many rulings, both with respect to the admissibility of evidence and the enhancement of sentences, that required the exercise of a great deal of discretion.

  After thorough review of the record, this panel believes that the district judge should have recused himself under 28 U.S.C. sec. 455(a). Only our rigid adherence to a procedural rule not followed in any other circuit and in significant tension with the decisions of the Supreme Court of the United States prevents our giving the relief that, under the prevailing national standards, would be granted. See, e.g., United States v. Bremers, 195 F.3d 221 (5th Cir. 1999) (vacating conviction because trial judge should have recused himself under sec.455(a)); Cooley, 1 F.3d at 998 (same); United States v. Brown, 539 F.2d 467 (5th Cir. 1976) (same). See also United States v. Waskom, 179 F.3d 303, 315-16 (5th Cir. 1999) (vacating sentence in guilty plea case even in the absence of specific allegation of sentencing error because trial judge should have recused himself); United States v. Reyes, 160 F.3d 258, 259 (5th Cir. 1998) (vacating sentence in guilty plea case because of failure to recuse).

  The majority characterizes the defendants' reference to the earlier mandamus proceeding as a waiver of the argument that mandamus should not be the only available remedy. The defendants state: "Defendants appeal the denial of recusal under 28 U.S.C. sec.sec. 144 and 455(b). The motion for recusal under 28 U.S.C. sec. 455(a) could only be, and was, appealed by mandamus." Appellant's br. at 49. This was sufficient to put this court on notice of our rule that only mandamus relief is available under sec. 455(a). It is indeed a parsimonious reading of this statement to characterize it as a knowing and intelligent waiver. Far from ignoring the issue,

the defendants specifically brought it to our attention. Because the defendants raised the matter, and clearly have maintained throughout this litigation that recusal under sec. 455(a) was required, this court should not be restrained from reconsidering in this case our position on the issue./1

   Moreover, even if the defendants did not raise this issue, we are in no way precluded from raising it on our own in the interests of justice. The Supreme Court has acknowledged that it often decides cases on issues other than those argued fully by the parties:

"On a number of occasions, this Court has considered issues waived by the parties below and in the petition for certiorari because the issues were so integral to decision of the case that they could be considered 'fairly subsumed' by the actual questions presented." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 37, 111 S. Ct. 1647, 114 L.Ed.2d 26 (1991) (Stevens, J., dissenting) (citing cases). The court has not always confined itself to the set of issues addressed by the parties.

Kolstad v. American Dental Assoc., 119 S.Ct. 2118, 2127 (1999). The Court has also specifically instructed the courts of appeals that they, too, may raise issues on their own initiative:

The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where injustice might otherwise result.

Singleton v. Wulff, 428 U.S. 106, 121 (1976) (citations and quotations omitted); see also Niedert v. Rieger, 200 F.3d 522, 527 (7th Cir. 1999) (quoting Singleton); United States v. Brown, 739 F.2d 1136, 1145 (7th Cir. 1984) (same).

   Prior to Singleton, the Ninth Circuit explained the circumstances that might motivate a court of appeals to address a matter without the benefit of full briefing by the parties:

There is . . . no rigid and undeviating judicially declared practice under which courts of review invariably and under all circumstances decline to consider all questions which have not

previously been specifically urged. Indeed there could not be without doing violence to the statutes which give federal appellate courts the power to modify, reverse or remand decisions as may be just under the circumstances. Exceptional cases or particular circumstances may prompt a reviewing court, where injustice might otherwise result or where public policy requires, to consider questions neither pressed nor passed upon below.

Nuelsen v. Sorensen, 293 F.2d 454, 462 (9th Cir. 1961) (citation and quotations omitted)./2 As we did in Niedert and Brown, and as the Ninth Circuit did in Nuelsen, so too have other circuits acknowledged that they may, when justice requires it, raise critical issues of law sua sponte./3 The Ninth Circuit wisely cautioned that this power must be "exercised sparingly." Nuelsen, 293 F.2d at 462. This case, however, is the sort of exceptional case that casts new light on procedures previously taken for granted.

If we may sua sponte raise and decide substantive questions of law, then surely we have the power to sua sponte alter the procedures we ask litigants to follow in their efforts to seek resolution of their substantive questions of law. It is well settled that stare decisis has less effect in the context of procedural rules, which do not serve as a guide to lawful behavior. See Hohn v. United States, 524 U.S. 236, 251-52 (1998); United States v. Gaudin, 515 U.S. 506, 521 (1995).

The prosecution of the El Rukn crime organization has been a deeply troubling episode. Chief Judge Aspen presided over the first trial of this particular case, and, in ordering a retrial, described the situation as tragic, noting that the prosecutorial misconduct in the case had wasted years of hard work by the courts, prosecutors, and law enforcement officers. See United States v. Boyd, 833 F. Supp. 1277, 1281 (N.D. Ill. 1993), aff'd, 55 F.3d 239 (7th Cir. 1995). Two other El Rukn trials were also declared mistrials. See United States v. Andrews, 824 F. Supp. 1273 (N.D. Ill. 1993); United States v. Burnside, 824 F. Supp. 1215 (N.D. Ill. 1993). As the judiciary was quick to correct an abuse of power in another branch of government after the first trial, it also ought to be willing to correct an error in its own house--even one made in good faith--so that the public can have confidence that, even in the most notorious of criminal cases, the evenhandedness of the judicial process is above reproach.

It is time for us to join the rest of the Country and permit review by appeal of a failure

to recuse under sec. 455(a). I would vacate the judgments of conviction and order a new trial.

/1 When a party does not make a fully formed argument that we should overrule our earlier precedent to align ourselves with other courts, the court may consider the argument waived. See United States v. Martin, 195 F.3d 961, 967 (7th Cir. 1999). Waiver is not mandatory, of course, but instead, appellate courts have the discretion to find that arguments are waived. See, e.g., Smith v. Freeman, 892 F.2d 331, 337 n.12 (3d Cir. 1989) (collecting cases). We are therefore under no obligation to avoid this question.

/2 See also All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., 887 F.2d 1535, 1538 n.3 (11th Cir. 1989) (quoting Nuelsen); Boals v. Gray, 775 F.2d 686, 691 (6th Cir. 1985) (same); Cohen v. West Haven Bd. of Police Comm'rs, 638 F.2d 496, 500 n.6 (2d Cir. 1980) (citing Nuelsen); McKissick v. United States, 379 F.2d 754, 759 (5th Cir. 1967) (quoting Nuelsen).

/3 See Curry v. Beatrice Pocahontas Coal Co., 67 F.3d 517, 522 n.8 (4th Cir. 1995) ("The normal rule of course is that the failure to raise an issue for review in the prescribed manner constitutes a waiver. But the rule is not an absolute one and review may proceed (even completely sua sponte) when the equities require." (citation omitted)); Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993) ("However, we have discretion to consider and decide sua sponte a dispositive issue of law."); Counts v. Kissack Water & Oil Serv., Inc., 986 F.2d 1322, 1325-26 (10th Cir. 1993) ("Although it is rarely done an appellate court may, sua sponte, raise a dispositive issue of law when the proper resolution is beyond doubt and the failure to address the issue would result in a miscarriage of justice.").